# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Detra Howard Mitchell, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No.: 1:10-cv-03621 |
| | § | HLM-WEJ |
| | § | |
| v. | § | |
| | § | <u>JURY TRIAL DEMANDED</u> |
| | § | |
| Georgia Power Company, Inc., | § | |
| | § | |
| Defendant, | § | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Comes Now, Plaintiff, by and through her counsel, files her opposition to Defendant's Motion for Summary Judgment as follows:

## I.  INTRODUCTION

Plaintiff filed a lawsuit where she made the following claims:  ADA discrimination;  ADA retaliation, Race Discrimination, Race Retaliation, Intentional Infliction of Emotional Distress, and Invasion of Privacy.  Plaintiff voluntarily dismisses her race discrimination and race retaliation claim.  Plaintiff opposes Defendant's motion for summary judgment as to the remaining claims, and shows the Court that Plaintiff has sufficient evidence to create factual issues for the jury as to each of these claims.

1

## II.    SUMMARY OF RELEVANT FACTS

Plaintiff was employed as a customer service representative in Defendant's Macon Office from 2001 until June 10th 2009. (Plaintiff's Dep. at pp. 39-40; Plaintiff's Exhibit 13 to Ellis Dep.)  Plaintiff was an excellent performer receiving recognition for her performance and receiving above average performance reviews. (Defendant's Exhibits 5,6 & 7 to Plaintiff's Dep.).  No evidence exists to support any assertion that Plaintiff was not qualified or capable of performing her job.

### April 30, 2008 Meeting

On April 30, 2008, Plaintiff made a request to her immediate supervisor, Mobley, to have a meeting to address front counter issue with some of her co-workers.  (Plaintiff Dep. at p.50).  Mobley agreed to the request as it is not unusual for her to allow a customer service representative to call and have a meeting so that workplace issues can be discussed.  (Mitchell Dep. at p. 51; Mobley Dep. at p. 50).  On April 30, 2008, a meeting was held and members of the customer service representative team who attended the meeting were: (1) Mobley; (2) Jan Edwards; (3) Nona Horton; (4) Cathy Smith Cole (5) and Plaintiff.   (Plaintiff Dep. at pp. 50-52).      During the meeting, Plaintiff addressed what she saw as teamwork problems and her coworkers passing off customers and not doing their jobs. (Plaintiff  Dep. at p. 53). Plaintiff pointed out specific acts committed by her co-workers, Smith and Horton, that she

believed illustrated her complaints. (Id.).   During the meeting, Mobley believed that Plaintiff's complaints were valid and refused to interrupt her.   (Plaintiff Dep. at p. 54; Cole Decl. at ¶¶ 28-29, Mobley Dep. at pp. 55, 57). Horton and Cole were offended by Plaintiff's accusations.  Cole began shouting and Horton began using profanity and crying.  (Mobley Dep. at p. 59; Plaintiff's Dep. at 54).  Plaintiff never shouted during the meeting.  (Mobley Dep. at p. 58).  When Mobley refused to stop Plaintiff, Cole left the meeting.  (Cole Decl. at ¶ 29). While Mobley testified that she did not like the tone Plaintiff has used, Mobley observed no conduct that Plaintiff had an emotional blow-up, a verbal blow-up or was a threat to the safety of herself or her co-workers.   (Mobley Dep. at p. 59).

Cole was upset about the way Mobley and Edwards had allowed the meeting to be conducted. (Cole Decl. at ¶ 29 ).  The following day, Cole complained to Ellis, because past complaints to Harrison regarding Mobley had been ignored. (Cole Decl. at ¶¶ 30-31 ).   Cole complained to Ellis about the meeting, and she specifically complained that both Mobley and Edwards did nothing to stop Plaintiff's complaints about their job performances.  (Cole Decl. at ¶ 30).  Cole complained that neither Mobley nor Edwards handled the meeting in a professional manner nor did they follow the Southern Company guidelines. (Id.).   But Cole never stated that Plaintiff demonstrated behavior that made

Cole believe Plaintiff might harm herself or any co-employee.  (Cole Decl. at ¶ 32).  Cole never complained that Plaintiff was incapable of doing her job.  (Id).  As the result of Cole's complaints, Mobley was given an oral coaching by Harrison and Ellis.  (Harrison Dep. at p. 37).  On May 7, Mobley said that her hand had been slapped because of the meeting and she gave Mitchell an oral coaching for calling the meeting as she was instructed to do.  (Plaintiff's Dep. at pp. 56, 60, 62-64).    Plaintiff did not believe that the coaching was fair and believed that it was based on false information.[1]   (Plaintiff's Dep. at p. 64).  Plaintiff asked Mobley what to do and Mobley advised her to file a workplace ethics charge.  (Id.).

## September 11, 2008 Meeting

On September 11, 2008, Plaintiff was called to a meeting by Debra Harrison, Caucasian female and white customer service manager.  Plaintiff had no idea about why the meeting was called.  When Plaintiff saw that Donna Ellis, Caucasian female and the HR representative, was present along with Jan Edwards, Caucasian female and senior customer service representative, she became concerned.  The meeting consisted of an aggressive interrogation of Plaintiff about various alleged performance infractions which Plaintiff at times vehemently disputed.  At times, Harrison was belligerent, raised her voice and pounded her fists on the table.

---

[1] Even though Cole was shouting at the meeting, she never received any informal coaching or disciplinary action.  (Cole Decl. at ¶ 33).

(Plaintiff Dep. at p. 109) Plaintiff believed that no one in the room was interested in her side of the story and that she had already been "convicted" of the alleged infractions. (Plaintiff's Dep. at pp. 105, 107).    At one point in the meeting, Plaintiff stated that as long as she had Jesus that she was not worried about any negatively (sic) on the job.  (Plaintiff's Dep. at p. 89, Plaintiff's Decl. at ¶ 4 ). After 45 minutes of being treated in this manner, Plaintiff became upset about the treatment and began to cry. (Plaintiff's Dep. at p. 105).  When Plaintiff began to cry, Ellis mocked Plaintiff's faith by stating to her that she thought that Plaintiff had Jesus.  (Plaintiff's Dep. at p. 89).   This further upset Plaintiff.  Plaintiff stated that she was depressed because of how she was being treated. (Plaintiff's Dep. at pp. 107, 108, 198).    Plaintiff was eventually granted permission to use the restroom, and upon return. Plaintiff was composed and twice requested to return to work.  (Plaintiff Dep. at p. 111).   Harrison denied each request.  (Plaintiff's Decl. at ¶ 5).

Harrison subsequently told Plaintiff was going to have a fitness for duty evaluation, because she had stated that she was depressed.  (Plaintiff Dep. at p. 113).  Harrison also told her that she had to immediately undergo drug and alcohol testing, and if she refused, she would be terminated "on the spot."  (Plaintiff's Dep. at pp. 113, 116).  Harrison took Plaintiff's badge and keys.  (Plaintiff's Dep. at p.

113).  Plaintiff went with Harrison and had the drug and alcohol testing, which proved negative.  (Ellis Dep. at p. 84).

## THE FITNESS FOR DUTY TEST AND PLAINTIFF'S RETURN TO WORK

Plaintiff was placed on administrative leave with no pay.  Plaintiff was forced to use her available sick time and vacation time so that she could be paid. (Plaintiff's Dep. at p. 152).   Plaintiff was forced to undergo psychological testing to see if she psychologically fit to perform her job.   (Defendant's Ex. 16 to Plaintiff's Dep.).     On September 23, 2008, Plaintiff signed a medical consent form because she was told by Defendant that if she refused she would be terminated.  (Defendant's Ex. 15 to Plaintiff's Dep.; Plaintiff's Dep. at pp. 120-121).  Prior to Plaintiff's appointment, Georgia Power informed Dr. Tillitski, the company-paid psychologist, that the reason for the requested evaluation was that "Mrs. Mitchell was displaying uncontrollable temper with outbursts.  Mrs. Mitchell creates a hostile work environment and there are concerns that her behavior may become violent." (Id.).   On September 23, 2008, Plaintiff, accompanied by her husband, kept her appointment with Tillitski.  (Plaintiff's Dep. at pp. 126-129). Tillitski told Plaintiff that she was there for anger management reasons.   (Id). After initial questioning by Tillitiski, Plaintiff was placed in a noisy and crowded reception area to complete a 500 questions psychological test. (Id.). Plaintiff did

the best that she could under those circumstances, answered everything that was given to her and left. (Id.).

On October 3rd, Plaintiff received a directive from Defendant informing her that she had an appointment to see Dr. Ahmadi on October 9, 2010. (Defendant's Ex. 38 to Plaintiff's Dep.; Plaintiff's Dep. at pp. 217-219). The directive informed Plaintiff that Kathy Pickard was assigned to be her Disability Case Manager. (Id.). The directive informed Plaintiff that she would be responsible for costs associated with any treatment that Defendant's company paid medical providers ordered. (Defendant's Exhibit 38 to Plaintiff's Dep.). Plaintiff was told by Pickard, the disability case manager, that Plaintiff that she would be monitored to make certain that she went to all doctor's appointments made for her by Georgia Power. (Plaintiff's Dep. at p. 219; Defendant's Exhibit 38 to Plaintiff's Dep.). Plaintiff was also verbally told that she was to take all medications as directed by Georgia Power's medical providers, and if not, Plaintiff would be terminated. (Id.). Due to the threat of being placed on medications and failure to "comply" could result in termination, Plaintiff hired an attorney. (Plaintiff's Decl. at ¶ 6). On October 6, 2009, Plaintiff's attorney sent an email to Harrison and Pickard, the Disability Case Manager, informing Defendant that Plaintiff was revoking her medical authorization, objecting to the intimidation used to get Plaintiff's medical authorization, objecting to Plaintiff's having to pay for the "fitness for duty"

evaluation and treatment associated with the evaluation, and Plaintiff's unpaid leave which forced her to use vacation and sick time in order to be paid. (Defendant's Exhibit 17 to Plaintiff's Dep.).   In response, Harrison sent a letter to Plaintiff stating that Plaintiff's administrative leave would be reclassified to paid leave and the appointment with Dr. Ahmadi was cancelled. (Defendant's Exhibit 18 to Plaintiff's Dep.).  Harrison requested that Plaintiff return for an appointment with Dr. Tillitski to complete her testing, and sign a new medical authorization. (Id.).  The appointment was scheduled for October 13.  (Id.).  Defendant stated that Plaintiff could not be returned to work until Tillitski's evaluation was completed. (Id.).  Plaintiff, wanting to return to work for both economic and personal reasons, complied with the request and returned to Tillitski for her scheduled appointment and finished the testing.  (Defendant's Exhibit 15 to Plaintiff's Dep.; Plaintiff's Decl. at ¶ 7).

On October 30, 2008, Plaintiff received communication from Harrison informing Plaintiff that Tillitski's completed evaluation recommend that Plaintiff is able to return to work due to her "inability to work with others…working with others is an essential function of your Customer Service Representative position." (Exhibit 20 and 40 to Plaintiff's Deposition).  Plaintiff is told to seek mental health counseling, a thorough medical evaluation, and possibly psychiatric review if your symptoms of emotional distress do not subside."  (Id.).  Plaintiff is told that she is

responsible for all costs and that she has been removed from paid administrative leave and effective on October 27, 2008, Plaintiff absences will be unpaid and she will be placed on docked time status requiring her to use her vacation time or sick time while she is out.  (Id.).  Harrison fails to inform Plaintiff that Tillitski has not found Plaintiff a danger to herself or others.  (Id.).  Harrison fails to inform Plaintiff that Tillitski has stated that Plaintiff cannot return to full-time unrestricted work, but states that she can return to half-day work for two weeks with the possible return to fulltime work in two weeks.  (Tillitski Decl. at ¶ 7; Defendant's Exhibit 40 to Plaintiff's Dep.).[2]  Upon receiving this information, Plaintiff requested a copy of Tillitski's evaluation, but Tillitski refused stating that it was Georgia Power's property, even though her HIPPA release stated that the evaluation should be forwarded to her attorney.  (Plaintiff's Dep. p. 124, Defendant's Exhibit 19 to Plaintiff's Dep.).

Plaintiff, at her own expense, retained her own psychologist, Dr. Ellison Cale, to conduct a psychological evaluation of her, and Plaintiff paid for it out of her own pocket.  (Plaintiff's Dep. at pp. 142, 282).  Plaintiff saw Cale on two occasions.   (Plaintiff's Dep. at pp. 142-143).   In November 2009, Plaintiff's attorney forwarded an evaluation from Plaintiff's psychologist, Cale, indicating that she was fit for duty and was not a threat to herself or others.  (Defendant's

---

[2] Tillitski admitted that he made a typographical error and his final evaluation of Plaintiff should be dated October 16 rather than November 16.  (Plaintiff's Ex. 1).

Exhibit 21 to Plaintiff's Dep.).    After submitting Cale's evaluation to Georgia Power, Plaintiff's attorney received a copy of Tillitski's "final" evaluation of Plaintiff from Defendant's legal counsel.[3]  (Defendant's Exhibit 21 to Plaintiff's Dep.; Defendant's Exhibit 40 to Plaintiff's Dep.). Following receipt, Plaintiff's attorney sent an e-mail dated December 8, 2008 to Defendant's counsel requesting that Plaintiff be placed in her job immediately because neither psychologist found Plaintiff a threat to herself or others.  (Defendant's Exhibits 13, 21, 40 to Plaintiff's Dep.).   Plaintiff's counsel also notes that the MMPI inventory shows at most only "borderline results for any specific assessment."    (Defendant's Exhibit. 21 to Plaintiff's Dep.).  Plaintiff's counsel demands that Plaintiff be placed back in her job and threatens to file a charge of discrimination against Georgia Power.  (Id.). On December 10, 2008, Defendant's counsel informed Plaintiff's counsel that Ms. Mitchell could return to work on January 2, 2009 – almost three months after she was sent home. (Defendant's Exhibit 22 to Plaintiff's Dep.).

**Plaintiff's Return to Work**

Prior to Plaintiff's return to work, Harrison had a meeting with the front desk customer service representatives and Mobley and Edwards.   Harrison told them that Plaintiff was returning to work on January 2, 2009.  (Cole Decl. at ¶ 35 ). At the meeting, Harrison walked back to Cole and specifically told her not to

---

[3] Defendant's legal counsel was Ashley Hager.  Ms. Hager is currently responsible for defending Georgia Power in this litigation.

worry that if Plaintiff made one mistake she was "outta there."  (Id.).  Cole

believed this to mean that Plaintiff would be terminated if she made on mistake.

(Cole Decl. at ¶ 35).

On Friday, January 2, 2009, Plaintiff returned to work to meet with

Harrison, Ellis and Mobley.  (Ellis Dep. p.112  ).  Plaintiff attended the meeting

where Defendant's expectations of her were reviewed and Georgia Power's

expectations of her are explained.  (Plaintiff's Dep. p. 15).  Plaintiff returned to

work on January 5, 2009 as a customer service representative.  (Ellis Dep. p. 112.

On January 2, meeting, Plaintiff is given a disciplinary written reminder.

(Plaintiff's Exhibit  3 to Harrison Dep.).  On March 9, 2009, Plaintiff filed an

EEOC charge alleging discrimination including ADA discrimination.  (Plaintiff's

Ex. 12 to Ellis Dep.).  Following that date, Defendant, including Ellis and Harrison

were notified of the charge. (Ellis Dep. at p. 153; Harrison Dep. at p. 152).

**Plaintiff's Termination**

Defendant has a policy against forced balancing. (Plaintiff's Decl. at ¶ 9 ).

The policy's definition of Force balancing "is any invalid /artificial adjustment to

Cash or a customer's credit to make a cash report balance. Do not force balance."

(Defendant's Ex. 46 to Plaintiff's Dep.at GPC003587).  This is the only

communication regarding forced balancing contained in Defendant's policies.

There is no evidence that Plaintiff made an invalid or artificial adjustment to her

11

cash report, the evidence merely shows that she miscounted her case which could be the result of problems with the cash counter. Plaintiff's errors were easily corrected by the procedures that Defendant had in place for outages. (Defendant's Exhibit 46 to Plaintiff's Dep. pages GPC003587-88).   Mobley does not have to report outages.  (Harrison Dep. 2 at p.9).   Plaintiff had nothing to gain by not reporting any outage since there are no disciplinary repercussions for outages. (Plaintiff's Decl. at ¶ 8).

Prior to Plaintiff's termination, forced balancing had always been interpreted to mean that a customer service representative cannot put money from an outside source including his or her own money or remove money from the cash fund in order to make it balance.  (Cole's Decl. at ¶¶ 12-16; Plaintiff's Decl. at ¶  9; Mobley Dep. at p.31).  To do so, would be forced balancing.  (Id.)  This was the applicable definition used by Mobley in discussing forced balancing with her customer service representatives.  (Id.).  The customer service representatives did not receive any training, notifications or written material that the definition had been broadened.  (Id.). Based upon the customary interpretation of forced balancing, Plaintiff has denied that she forced balance.  (Plaintiff's Decl. at ¶ 9 ).

Defendant has alleged that Plaintiff forced balance because she showed that she was in balance in the computer system and the bank notified them that she was not in balance. (Harrison Dep. p. 30).  If Plaintiff had "forced balanced" according

to Defendant's customary interpretation of "forced balancing" the bank would have showed no outage. (Plaintiff's Decl. at ¶ 10). The convenient broadening of the definition is evidenced by Mobley's explanation that she did not report Plaintiff's first two alleged forced balancing incidents because she was not certain that it was forced balancing. (Mobley Dep. at p. 100). Mobley did not give Plaintiff any formal type of disciplinary warning, oral or written, for these alleged infractions. (Mobley Dep. pp. 97-98). Plaintiff was the first person to be terminated for forced balancing in the Macon district under the supervision of Harrison. (Mobley Dep. p. 98).[4]

Harrison has testified that Georgia Power's policy is that an employee who had been found to have forced balance is to be terminated on the first offense. (Harrison Dep. p. 152, Harrison Dep. 2 at pp. 10-12). Harrison terminated Plaintiff the first time that she became aware that Plaintiff had forced balanced. Harrison states that one instance of forced balancing always results in termination. (Harrison Dep. at p. 152, Harrison Dep. 2 at pp. 10, 12). This contradicts Ellis' testimony that there is no policy that states that forced balancing must result in termination. (Ellis Dep. at p. 143). Harrison stated that she referred to information provided to her by Defendant's workplace ethics personnel, but she cannot produce any documentation where the personnel told her that she must terminate Plaintiff or

---

[4] Cole was terminated in October of 2009. (Cole Decl. at ¶ 18)

identify any individual who told her that she must terminate Plaintiff. (Harrison Dep. 2 at p. 57-58).  In fact, the testimony offered by Palmore, the individual who did the internal investigation and Mollock, the workplace ethics representative, both dispute Harrison's testimony.  They do not make a termination recommendation, they merely state that in their opinion, Plaintiff forced balanced. (Palmore Decl. at ¶ 7, Mollock Decl. at ¶ 7).

Harrison was aware that Defendant had a written disciplinary policy referred to as the "positive discipline process." (Harrison Dep. at p. 114; Plaintiff's Ex. 2). It starts with informal coaching, if the infraction is more severe, the employee receives an oral reminder which is kept in the employee's file for a year.  (Harrison Dep. p. 110).  If more attention is needed a written reminder is issues and placed in the employee's file for a year.  (Harrison Dep. at p. 111).  The policy requires a manager to consider the following items in meting out discipline – (1) length of service, (2) overall work record, (3) recent discussions about this problem or other problems and (4) then need to discuss with other for consultation /approval. (Harrison Dep. p. 119).   The policy states that a manager can discipline an employee by requiring an employee to take Decision Making Leave (DML).[5]   An infraction of a zero tolerance policy requires utilization of a DML.  (Harrison Dep.

---

[5] Decision-making leave is where an employee is sent home on administrative leave to think about the identified behaviors that need to be corrected and return with a written commitment about what the employee plans to do to correct the behavior. (Harris Dep. p. 120).

p. 121).   Plaintiff was not given a DML prior to her termination.  (Plaintiff's Decl. at ¶ 11).  Harrison admits that even when a manager is disciplining an individual who allegedly has forced balancing, the positive discipline policy must be used. Harrison Dep. at p. 147).

Harrison states that she referred to Defendant's disciplinary policy standards prior to terminating Plaintiff, but these standards list offenses that can result termination upon the first offense but they do not list "forced balancing." (Harrison Dep. 2 at p. 11; Plaintiff's Ex. 2. 2).  Mobley cannot remember how many or if she had ever given Plaintiff any oral reminders consistent with the policy. (Mobley Dep. p. 87).  Harrison states that she only knows that the first offense of forced balancing required termination due to word or mouth.  (Harrison Dep. at p. 17). Harrison can point to no written policy or directive that indicates that a first time offense automatically leads to termination. Harrison admits that she knew of no other conduct by Mitchell that warranted counseling or discipline. (Harrison Dep. at p. 17 ).

### Defendant's Disparate Discipline Enforcement

On January 21, 2010, Horton failed to properly show an outage of $21.00 on her end of the day report.  (Plaintiff's Ex.4).  Horton called Mobley who told Horton to e-mail her and they would take care of it in the morning.  (Id.).  On January 28, 2010, Nona Horton was issued a written reminder due to her

mishandling of cash.  (Ellis Dep. at pp. 119-120).  Horton had left her cash bag

containing collected cash and endorsed checks in a bag on the front counter, and

had failed to place them in the safe for safekeeping.   (Plaintiff's Ex. 5).  Mobley

was also informed by Plaintiff that Horton had passed counterfeit money in 2009,

but after denying any knowledge of the incident, Mobley has now come forward

with a declaration that she counseled Horton regarding the incident but did not

report it to anyone else as required.  (Mobley Dep. at 80-82; Mobley Decl. at ¶ 23).

## III.    STANDARD FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment may be entered on a claim only "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party

asking for summary judgment "always bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of the

'pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any,' which it believes demonstrate the absence of a genuine

issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). The movant can meet this burden by presenting

evidence showing there is no dispute of material fact, or by showing, or pointing

out to, the district court that the nonmoving party has failed to present evidence in

16

support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324, 106 S.Ct. 2548.

Once the movant meets its initial burden, the burden then shifts to the nonmovant to make "a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990). To satisfy this burden, the nonmovant cannot rest on its pleadings, but must, by affidavit or by other means, set forth specific facts showing that there is a genuine issue for trial.

The court's function in deciding a motion for summary judgment is to determine whether there exists genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir.1987). It is substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When a court considers a motion for summary judgment, it is to refrain from deciding any material factual issues. All evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142

(1970); *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir.1996); *Early,* 907 at 1080.

## IV.   PLAINTIFF'S ADA CLAIM

Plaintiff has alleged that Georgia Power "regarded her" as disabled when she was forced to leave work on September 11th, forced to undergo immediate drug and alcohol screening under the threat of termination, subsequently forced to undergo psychological testing or "fitness for duty" testing, forced to sign a consent to release her medical records, told that if she did not take prescribed drugs that she would be terminated, and she was not allowed to return to work until she hired an attorney and paid for her own psychological testing.

In order to prevail on a "regarded as" ADA claim, Plaintiff must show one of the following:  (1) she has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation: (2) she has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; or (3) she has no physical or mental impairment but is treated by an employer as having such an impairment. 29 C.F.R. § 1630.2(i ). Second, the regulations define major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Last, the regulations direct the court to

consider three factors when determining whether an impairment rises to the level of "substantially" limiting: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

When a plaintiff claims, as in this case, that the major life activity is working, the regulations are more specific about the meaning of "substantially." The plaintiff must be able to prove that he was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(i). Case law has emphasized that the plaintiff must be precluded from more than one particular task or type of job to rise to the level of "substantially" limited. *See Sutton v. United Air Lines,* 527 U.S. 471, 492, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *Cash,* 231 F.3d at 1306.

Georgia Power has offered three reasons to the Court supporting its motion for summary judgment as to Plaintiff's ADA claim. They are: (1) "it is undisputed that Plaintiff had an emotional outburst during a meeting – saying she was depressed, and asking for help. (Miller Decl. ¶ 3); (2) no evidence existed to support any contention that Mr. Miller believed that Plaintiff had a physical or mental impairment or that she was substantially limited in any major life activity.

(Miller Decl. ¶ 5); (3) the mere fact that Plaintiff was sent for a fitness-for-duty evaluation is not evidence that she was regarded as disabled.  (See Defendant's Brief p.13).  Plaintiff has sufficient evidence to dispute these alleged defenses and to create fact issues for the jury.

A.     Defendant's Suspension of Plaintiff and Requiring a Fitness for Duty Evaluation is an ADA Medical Inquiry Violation.

The ADA prohibits "medical examinations and inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of such disability, unless the examination can be shown to be job-related and consistent with a business necessity."   42 U.S.C.A. § 12112 (d)(4)(A). Defendant fails to produce sufficient evidence that would allow a jury to conclude that there was any job-related reasons or business necessity to force Plaintiff to leave her job on September 11, to force her to take drug and alcohol testing that very day, suspend her, and force her to take psychological fitness for duty testing with a company retained psychologist prior to returning to work.  The meeting attendees testified that Plaintiff did not demonstrate any conduct indicating that she was a threat to herself or her co-workers.  No evidence exists demonstrating that Plaintiff's co-workers or immediate supervisor ever observed any conduct making concerned about Plaintiff's emotional state or fear Plaintiff would harm them or herself. As demonstrated by Plaintiff's satisfactory performance reviews received

during the relevant time period no evidence supports any contention that Plaintiff was not performing or could not perform her job.  In fact, it was quite the contrary as evidenced by Plaintiff's performance reviews and awards.

The facts of this case are significantly distinguishable from *Watson*.  *See Watson v. City of Miami Beach*, 173 F.3d 932, (11th Cir. 1999).  *Watson* involved a police officer where co-workers had stated that he was threatening and paranoid. In addition, the co-workers stated that the *Watson* plaintiff overreacted in many situations.  The Eleventh Circuit held that the employer had good cause for concern as to whether the plaintiff was fit to be a police officer, and the ordered fitness for duty examination was justified as being job related.  *Watson* at 935. In the instant case, Georgia Power has not produced sufficient evidence to show that the ordered medical examination of Plaintiff was job related.

Case law consistently supports the legal premise that the requirement of a fitness for duty examination must be supported by observations of conduct that would support a business related reason for the medical testing.  "This means that the employer must have a reasonable belief based upon objective evidence that an employee will be unable to perform the essential functions of her job because of a medical condition."  *Snyder v. Potter, Postmaster General*, 109 LRP 78262 (2010) (holding where the ordering of a fitness for duty examination was the result of the complainant's "irrational behavior" and strained relationships with co-workers

may warrant discipline, but the fitness for duty examination was unlawful because the agency did not have sufficient evidence to support a showing that it had a reasonable belief that the complainant posed a direct threat to herself or to others or could not perform the essential functions of her position).[6]  It is the burden of the employer to show that its disability-related inquiries and requests for medical examination are job-related and consistent with business necessity.

The burden is on the employer to show that its disability inquiries and requests for medical examination are job-related and consistent with the business necessity. *See Cerge v. United States Department of Homeland Security*, EEOC Appeal No. 0120060363 (October 9, 2007).   Even when considering the facts in the light most favorable to Defendant, the only evidence for the decision to order Plaintiff to submit to a fitness for duty examination was "that Plaintiff has broken down in the middle of a meeting with human resources and had begun crying, saying she was depressed and asked for help."  (Defendant's Brief at p.4 citing Miller Decl. at ¶ 3). This is not sufficient to establish the required business reason to make a fitness for duty examination lawful under the ADA.  *See Mahoney v. Ernst & Young LLP*, 487 F.Supp.2nd 780, 814 (S.D. Texas 2006)(in denying a defendant's motion for summary judgment, the court states that "weeping while in a meeting in the human resources even if temporarily uncontrolled is hardly a legitimate basis for ordering

---

[6] This case involved violations of the Rehabilitation Act which requires the same analysis as the ADA regarding medical examinations.

the employee to leave work or to undergo an IME before returning to work"); see

also *Gallup v. City of Alexander City*, 287 F.Supp.2d 1286 (M.D. Alabama 2003).

B. Miller's Statement That He Did Not Believe Plaintiff Had a Physical or Mental Impairment or That She Was Substantially Limited in Any Major Life Activity Does Not Defeat Plaintiff's Claim.

Georgia Power cannot rely merely upon the statement of Miller to defeat

Plaintiff's claims.   Georgia Power has produced no evidence that this decision-

maker did an independent investigation prior to making his decision.  *See Stimpson*

*v. City of Tuscaloosa,* 186 F.3d 1328, 1332, (11th Cir. 1999)(decision-maker who

does not conduct an independent investigation is subject to the "cat's paw" theory

which allows a plaintiff to show that the decisionmaker followed the biased

recommendations of another employee).   This statement merely creates a factual

dispute to be decided by the jury. [7]

The courts have recognized that actions speak louder than words.   On

September 11th, Plaintiff was not allowed to return to work when she requested to

do so.   Plaintiff was forced to undergo drug testing that same day, and threatened

with immediate termination if she did not cooperate. Plaintiff was ordered to

---

[7]  Ellis was a participant in the September 11 interrogation of Plaintiff and ridiculed Plaintiff about her faith when she began to cry.  Ellis, and only Ellis, provided Miller with information that Plaintiff began to cry in the meeting, stated that she was depressed, and was asking for help.   Ellis did not inform Miller that Plaintiff had requested a break, regained her composure and twice asked to go back to her job.

undergo psychological testing and counseling and could not return to work without the authorization of the company paid for psychologist. The company-paid psychologist had been told by Georgia Power that Plaintiff was being referred to him for an evaluation because "Mrs. Mitchell was displaying uncontrollable temper with outbursts. Mrs. Mitchell creates a hostile work environment and there are concerns that her behavior may become violent."[8] Plaintiff was told that if she would have to undergo periodic urine testing to prove that she was taking any medication prescribed to her by the company medical provider and if the testing indicating that she was not taking the prescribed medications, she would be terminated. Plaintiff was initially suspended without pay and was forced to utilize all available accrued vacation and sick days. Plaintiff was not allowed to return to work to any job on a limited or full-time basis during her four month forced absence from work. In fact, Plaintiff was not allowed to return to work until she hired an attorney who communicated Plaintiff's opposition to Georgia Power's unlawful conduct. Plaintiff then had to expend additional monies to hire a psychologist who tested Plaintiff and determined that Plaintiff should be returned to work.

Thus, Georgia Power's conduct creates material issues of fact as to whether Georgia Power viewed Plaintiff as mentally impaired and substantially limited in

---

[8] Defendant has produced no evidence to support these statements.

the area of working.  *See Mahoney v. Ernst & Young LLP*, 487 F.Supp.2[nd] 780, 814

(S.D. Texas 2006) (denying summary judgment on ADA claim based upon

plaintiff's submission of the following evidence:  Plaintiff was sent home after she

began to cry during a harsh critique of her job performance, an IME requirement

was imposed, the employer's refusal to reinstate her to any position, the

employer's reaction to her attempts to be reinstated and her physician's release to

work); see also *Gallup v. City of Alexander City*, 287 F.Supp.2d 1286 (M.D.

Alabama 2003) (denying summary judgment where plaintiff presented sufficient

evidence consisting of supervisors actions and comments to create fact issues as

whether the employer regarded him as disabled).

C. <u>A Jury Could Find that Defendant's Business Reason for Ordering the Fitness for Duty Examination is Pretext.</u>

C. A Jury Could Find that Defendant's Business Reason for Ordering the Fitness for Duty Examination is Pretext.

Defendant's apparent business reason for suspending Plaintiff on September 11,

was its concern for Plaintiff because she had asked for help, because no evidence

has been submitted evidencing a business reason for the actions.. (See Defendant's

Brief p.  14).   Both Harrison and Ellis have testified that the reason that Plaintiff

was sent for a fitness for duty examination was because she was depressed. Now

Defendant has offered a declaration were Harrison states that she has questions

rather Plaintiff could perform her job. (Harrison Decl. ¶ 13).   Contradictory

testimony is evidence of pretext.  A jury could easily find enough facts to support a

finding that this reason was not true.

Defendant's actions were not nearly as "compassionate" as the actions ascribed to the Defendant in *Johnson v. Boardman Petroleum, Inc*., 923 F.Supp. 1563, 1568 (S.D. Ga. 1996).  In *Johnson*, the defendant merely suggested that plaintiff, who was dealing with the death of her husband, take a leave of absence, suggested she seek professional help prior to returning to work and requested a doctor's release prior to her return.  Plaintiff was returned to work after producing her release from her medical provider.  *Johnson* at 1586-1589).

Here, Plaintiff was not given any choice at all.  After crying in a meeting and stating that she was depressed, Plaintiff regained her composure and requested to return to work twice and was denied. Instead, Plaintiff was immediately sent for a drug and alcohol testing under the threat of termination, suspended without pay, ordered to psychological testing to determine her fitness for duty.  In addition, Georgia Power exhibited their "compassion",  by threatening Plaintiff with termination if she did not take any medications as prescribed by Georgia' Power's medical providers and was told that she would have to undergo periodic urine testing so that Georgia Power make certain that she was following the instructions of its medical provider.  Georgia Power refused to immediately place Plaintiff back in her position even after she produced medical documentation from her on psychologist stating that she was able to perform her job.  Georgia Power did not place Plaintiff back to work until Plaintiff's attorney threatened Georgia Power

with an ADA discrimination lawsuit, and only then, did Georgia Power arrange for Plaintiff to return to work in January 2009 – approximately three months after her initial suspension.

## V.    PLAINTIFF'S  ADA RETALIATION CLAIM

To establish a prima facie case of retaliation, Plaintiff must show that "(1) she engaged in protected activity under the ADA; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278 (11th Cir. 1997).

Defendant argues that Plaintiff has not produced sufficient evidence to create issues of material facts as to the causal connection.  Defendant argues that the length of time between the protected activity and the termination was too long and Plaintiff's intervening misconduct broke the causal connection.  (Defendant's Brief p. 20).  Plaintiff disputes Defendant's assertions.

### A. Jury Issue Exists As To The Causal Connection.

Defendant does not dispute that Plaintiff engaged in a protected activity when she filed her EEOC charge, but Plaintiff actually first complained about disability discrimination on December 8, 2008 when her attorney sent a letter to Defendant's threatening to file a discrimination charge.  *See Mahoney v. Ernst & Young, LLP*, 487 F.Supp.2d 780 (S.D. Texas 2006)(letter from employee's

attorney opposing employer's actions that allegedly violated employee's FMLA rights would qualify as protected activity).

Defendant does not deny that the decisionmaker had knowledge of the Plaintiff's EEOC charge, only that the intervening three months from the time Plaintiff filed her charge and the adverse action is too long pursuant to the law. This is a misstatement of the law.

The causal link requirement is construed broadly; a plaintiff must merely prove that the protected activity and the negative employment action are not completely unrelated. *EEOC v. Reichold Chem. Inc*., 988 F.2d 1564, 1571- 72 (11th Cir. 1993).  A gap of more than three months between the protected activity and the adverse employment action is not sufficient to satisfy the close proximity *when no other facts exist to show a causal connection.  Shipley v. Hypercom*, No. 1:09-CV-00265 (RGV), 2011(N.D.Ga. February 15,2011) (citing *Redding v. Norboard, Ga., Inc,* N0. 5:07-CV-451(CAR), 2010 WL 339783, at \*9 (M.D. Ga Jan. 21, 2010).

Here, Plaintiff has other evidence to support the causation prong.  This includes the fact that Harrison, the admitted decisionmaker in Plaintiff's termination told another customer service representative that Plaintiff would be

"outta here" when Plaintiff made her first mistake.[9]  Evidence also would support a jury finding that that Harrison acted out on that promise.  The evidence includes the following:  (1) Harrison was the decisionmaker who terminated Plaintiff; (2) Plaintiff was the first person ever terminated for "forced balancing;"   (3) Defendants allege that Plaintiff committed forced balancing three times, but she was not terminated until Harrison was informed; (4) the inconsistent testimony as to what forced balancing is; (5) Harrison stated that the company has a zero tolerance for forced balancing which is disputed by Defendant's own polices; (6) Defendant's disciplinary policy was not followed in the termination of  Plaintiff and (7 ) other individuals who had committed more egregious violations of the money handling policy were not terminated.   Thus, based upon the broad interpretation of the causation element, as required by the Eleventh Circuit, and viewing all facts in the light most favorable to the nonmovant, a reasonable juror could conclude that Plaintiff's termination was causally connected to Plaintiff's protected activities.

---

[9] Harrison had knowledge of Plaintiff's complaints about her suspension because complaint  had been sent to her from Plaintiff's attorney.  Harrison also communicated to Plaintiff that she had been unfit to return to work but failed to fully and honestly represent Tillitski's evaluation to Plaintiff.  The report actually said that she could not return to full-time unrestricted work but laid out a plan for part-time work that would lead to full-time work in a matter of weeks. Harrison knew that Plaintiff was being returned to work because she conducted a meeting with the customer service representatives informing them that Plaintiff was returning to work.  Harrison also conducted the meeting with Plaintiff on January 2nd where Plaintiff was given a written warning as to her attendance.

B. <u>Jury Issue Exists as to the Intervening Misconduct</u>

Defendant's argument that Plaintiff's intervening misconduct defeats the causal connection prong of Plaintiff's prima facie case also fails to defeat Plaintiff's claim.  While an intervening act of misconduct may break the causal chain between the protected activity and retaliatory action, there is a genuine issue of material fact whether Plaintiff committed any misconduct that warranted the adverse action of termination.  Plaintiff's alleged misconduct is that she "forced balance."  Plaintiff has denied that she forced balance and has produced evidence that Defendant has manufactured a new definition of forced balancing that neither she nor other customer service representatives had knowledge of or training.  This is also supported by the fact that Plaintiff was the first person to be terminated for this definition of forced balancing.

C. <u>A Jury Issue Exists as to the Legitimacy of Defendant's Business Reason for Plaintiff's Termination.</u>

To establish pretext, a plaintiff must present concrete evidence the form specific facts showing that defendant's proffered reason was pretext.  Plaintiff can show pretext by demonstrating such weakness, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find unworthy of belief.  *See Standard v. A.B.E. L. Servs., Inc.*, 161 F.3d. 1318, 1332 (11th Cir. 1998).  Dishonesty alone can be a sufficient basis for a jury to conclude that the employer

is covering up a discriminatory motivation for an employee's discharge.   *Paz v. Wauconda Healthcare*, 464 F. 3d 659, 665 (7th Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). This case should be allowed to go to a jury because it is full of inconsistencies, incoherence, and implausibilities.

Plaintiff has produced evidence that disputes Defendant's well -rehearsed definition of "forced balancing."  Plaintiff had produced evidence that disputes the decision-maker's contention that "forced balancing" requires automatic termination.  Ellis' deposition testimony contradicts the deposition testimony of Harrison.  Contrary to her testimony, Harrison received no recommendations from either Workplace Ethics or the internal investigator that Plaintiff must be terminated or should be terminated.   These individuals merely concluded that Plaintiff had forced balanced.  (Mollock Decl. at ¶ 7; Palmore Decl. at ¶ 7).

Plaintiff has produced evidence that demonstrates that Harrison was looking for an opportunity to get Plaintiff "outta here," and used Plaintiff's errors to terminate her and failed to follow Defendant's disciplinary policy.  Harrison admitted that even employees who commit a "zero-tolerance" infraction are given the DML opportunity.  It is undisputed that Plaintiff was not given a DML opportunity. Harrison admitted that even for employees who are accused of "forced balancing," the Defendant's disciplinary polices are to be used.

31

Defendant has now produced witness declarations that contradict deposition testimony.  Mobley who has testified that she did not report Plaintiff's alleged forced balancing of May 5 and May 13 because she did "not know if it was forced balancing." (Mobley Dep. at pp. 100, 110).  In Mobley's declaration, Mobley now claims that she did not report it because of scheduling conflicts.  Mobley Decl. at ¶ 16).  In Mobley's deposition testimony, Mobley testified that she had no knowledge of a complaint made about Horton passing counterfeit money and therefore  never took any action as to this complaint.  (Mobley Dep. at pp. 80-82).  Mobley has now stated in her declaration that she reviewed her performance notes and now recalls that she did receive such a complaint about Horton and she discussed the allegation with Horton, but did not report it to anyone else.  (Mobley Decl. at ¶ 23.).  Additionally Defendant has failed to produce the performance note referred to by Mobley.

Harrison has produced a declaration that stated that "intent" does not matter in determining forced balancing.  (Harrison Decl. at   ¶ 26).  Yet, the definition clearly states that forced balancing is an "artificial or invalid" adjustment to cash …to make a cash report balance, implies intent in the definition.  Harrison states in her declaration that she is not aware of anyone who has been found to have forced balance that was not terminated but in both her deposition and this declaration, she

could not identify any other individuals.   (Harrison Decl. at ¶ 27; Harrison Dep. at p. 143 ).

Finally, Defendant has tried to narrow the reason for Plaintiff's termination down so much that Plaintiff would have no comparators.  They have narrowed it down to the point where Plaintiff was the first one ever terminated for this offense by Mobley and Harrison[10].  But even more alarming, is the admission by Mobley that she purged her files of all discussion guides or performance guides for the relevant years.   (Mobley Dep. at p. 80).

Even customer service representatives who made more egregious infractions were not terminated for their first offense.  These individuals including Horton, who with the addition of passing counterfeit bills, failed to make her deposit and left her cash bag on the front counter where it was found the next morning received only a written reprimand. (Mobley Dep. at pp. 80-82).  Obviously this would result in her cash drop not matching her computer system reporting.

When the evidence is taken in the light most favorable to the Plaintiff, there are sufficient factual issues for a jury to decide if Plaintiff was terminated in retaliation for her complaints about discrimination.

### VI.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

---

[10] Conveniently, Cole, a white employee is terminated for the same alleged offense several months after Plaintiff has terminated and shortly after she has amended her EEOC complaint to add a to her race discrimination and retaliation claims her termination.

To establish a claim for intentional infliction of emotional distress, Plaintiff must show that Defendant's conduct was (1) intentional or reckless; (2) extreme and outrageous; and (3) the cause of severe emotional distress. *Bridges v. Winn-Dixie Atlanta,* Ga. App. 227, 230(1)(335 S.E.2d 445 (1985). "The rule of thumb in determining whether the conduct complained of was sufficiently extreme and outrageous is whether the recitation of the facts to an average member of the community would arouse her resentment against the defendant so that she would exclaim[,] 'Outrageous!' "*United Parcel Service v. Moore*, 238 Ga. App. 376, 377 (519S.E.2d 15 (1999).

Here, Plaintiff asserts that a jury would find that Defendant's conduct as described in Plaintiff's Statement of Material Facts and in Section IV (C) of this brief as outrageous.  In addition, the medical provider's, who saw Plaintiff during this time noted on the evaluations that it was Defendant's actions which had created the emotional distress for Plaintiff. [11]

## VII.   INVASION OF PRIVACY

To establish a state claim for the invasion of privacy, Plaintiff must establish (1) that Defendant committed a physical intrusion,  analogous to trespass, into Plaintiff's solitude or private affairs, and (2) the intrusion would be objectionable to a reasonable person.  *Pierri v. Cingular Wireless, LLC,* 397 F. Supp.2d 1364,

---

[11] Plaintiff's medical evaluations, Defendant's Exhibits 13 and 40 to Plaintiff's deposition will be submitted to the court under seal for privacy reasons.

1381 (N.D. Ga. 2005).  The Georgia Supreme Court has held that an individual's medical records are within the constitutional protections provided by fundamental constitutional right of privacy.  *King v. State*, 272 Ga. 788, 535 S.E.2d 492 (2000) Furthermore, the Georgia Supreme has held that medical information, as reflected in the records maintained by medical providers, was a matter which a reasonable person would consider to be private.  (Id.)

Plaintiff was sent a letter written by Harrison that directly quotes a medical provider's report.  This alone presents a question of fact as to whether Plaintiff's right to privacy was violated.  Plaintiff's also asserts that Defendant's requirement of an unlawful fitness for duty test accompanied by a requirement that she must have a medical evaluation and grant access to her medical records was an unlawful violation of  her right to privacy.   Plaintiff has presented evidence that she signed a release, for her medical records, it was under the threat of termination.  Plaintiff has also presented evidence that the release was rescinded, but when she was told that she would not be able to return to work unless underwent further evaluation and signed another medical release, she did so.  At the time, Plaintiff signed the release because she needed to return to work, needed her salary, and did not want to be terminated.  Basically, Plaintiff had no choice but to release her medical records.  These facts would support a jury's finding that Plaintiff's right to privacy was violated.

## VIII.  SUMMARY

For all of the above stated reasons, Plaintiff requests that Defendant's Motion for Summary Judgment be denied on all counts, and Plaintiff be allowed to have the jury decide the merits of her claims.

Respectfully submitted this 21st day of March 2012.

> s/Jamie G. Miller
> Jamie G. Miller
> Georgia State Bar No. 507159
> Attorney for Plaintiff

**LAW OFFICE OF JAMIE MILLER**
3399 Peachtree Road NE, Suite 400
Atlanta, Georgia 30326
(404) 601-2861
title7@mindspring.com

Certificate of Compliance and Service

I hereby certify the foregoing document has been typed in Times New Roman 14 point font, and is in compliance with Local Rule 5.1B that on April 14, 2011 I electronically filed the foregoing Plaintiff's Responses to Initial Disclosures with the Clerk of Court using the CM/EF system, which send notification of the filing to the following CM/EF participant:

> Ashley Hager
> Kristina N. Klein
> Troutman Sanders LLP
> 5200 Bank of America Plaza
> 600 Peachtree Street, NE

Atlanta, Georgia 30309

This 21st day of March 2012.

s/Jamie G. Miller