IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DETRA HOWARD MITCHELL,

        Plaintiff,

   v.

GEORGIA POWER COMPANY,

        Defendant.

CIVIL ACTION FILE

NO. 1:10-CV-03621-HLM-WEJ

## ORDER AND
## FINAL REPORT AND RECOMMENDATION

Plaintiff, Detra Howard Mitchell, filed this action against her former employer, Georgia Power Company ("GPC"), asserting that defendant discriminated against her and retaliated against her in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). (First Am. Compl. [19] ¶¶ 70-80.) She also asserts state law tort claims of intentional infliction of emotional distress ("IIED") (id. ¶¶ 81-85) and invasion of privacy (id. ¶¶ 86-91).

Now pending before the Court are Defendant's Motion for Summary Judgment [51] and Defendant's Motion to Strike Portions of Plaintiff's Declaration

[76].  In briefing the summary judgment motion, plaintiff voluntarily dismissed her Title VII and Section 1981 race discrimination/retaliation claims.  (See Pl.'s Opp'n to Def.'s Mot. for Summ. J. [73-1] 1 ("Pl.'s Resp.").)   Accordingly, summary judgment should be entered against plaintiff on those claims.

Plaintiff asserts that GPC violated the ADA because it:  (1) "regarded her" as disabled in September 2008 when it placed her on administrative leave and forced her to undergo a fitness for duty evaluation ("FDE"), which she asserts was an improper medical examination (First Am. Compl. ¶¶ 71-72); (2) terminated her in June 2009 on account of a perceived disability (id. ¶ 73); and (3) terminated her in June 2009 in retaliation for having engaged in conduct protected by the ADA (id.). Defendant moved for summary judgment on all of these ADA claims (see Br. in Supp. of Def.'s Mot. for Summ. J. [51-1] ("Def.'s Br.")), but plaintiff did not respond to GPC's argument that her discriminatory termination claim failed as a matter of law.  (See generally Pl.'s Resp.)  The Court thus deems that claim to have been abandoned.  See Burnette v. Northside Hosp., 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party.").  Accordingly, summary

2

judgment should be entered against plaintiff on the claim that defendant terminated her in June 2009 on account of a perceived disability.

Therefore, the only claims that remain are that (1) GPC regarded plaintiff as disabled in September 2008 when it placed her on administrative leave and forced her to undergo a FDE, which she asserts was an improper medical examination; (2) GPC violated the ADA by terminating plaintiff in June 2009 in retaliation for having engaged in conduct protected by the ADA; and (3) GPC violated Georgia tort law by (a) intentionally inflicting emotional distress upon her and (b) invading her privacy.

For the reasons explained below, the undersigned **REPORTS** that no disputed issues of material fact remain to be tried on these remaining claims, and thus **RECOMMENDS** that Defendant's Motion for Summary Judgment [51] be **GRANTED**.   In conjunction with its consideration of that summary judgment motion, the Court **ORDERS** that Defendant's Motion to Strike [76] be **GRANTED IN PART**.

3

## I.   **STATEMENT OF FACTS**

In support of its Motion for Summary Judgment, GPC as movant filed Defendant's Statement of Undisputed Material Facts [51-2] ("DSMF").  See N.D. Ga. R. 56.1(B)(1).  As required by Local Rule 56.1(B)(2), Ms. Mitchell as respondent submitted Plaintiff's Response to Defendant's Statement of Material Facts [66-2] ("R-DSMF").  Further, as required by Local Rule 56.1(B)(2)(b), Ms. Mitchell submitted Plaintiff's Statement of Material Facts Which Creates Genuine Issues for the Jury [73-2] ("PSMF"), to which GPC responded.  (See Def. GPC's Resp. to Pl.'s Statement of Material Facts [77-1] ("R-PSMF").)[1]

In those instances where either party admits the other's proposed fact, the Court deems it undisputed, and cites both to the proposed fact and the corresponding

---

[1] Defendant's Motion to Strike challenges some or all of paragraphs 8-12 and 14-15 of Ms. Mitchell's Declaration [72-1].  Three of those paragraphs (Nos. 12, 14-15) were not included in PSMF, which is the document a respondent uses to direct the Court to facts which she contends are material and create a triable issue.  See N.D. Ga. R. 56.1(B)(2)(b); Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008).  Thus, there is no need to consider striking those paragraphs of plaintiff's Declaration.  Moreover, for reasons explained infra, the Court has excluded some paragraphs of PSMF which are supported by some of the challenged paragraphs of plaintiff's Declaration.  (See PSMF ¶ 97 (supported by Mitchell Decl. ¶ 8); PSMF ¶ 104 (supported by Mitchell Decl. ¶ 10); and PSMF ¶ 116 (supported by Mitchell Decl. ¶ 11).)  There is no need to strike those paragraphs of plaintiff's Declaration, because the proposed facts they support have been excluded.

4

admission.  In those instances where either party denies the other's proposed fact (in whole or in part), the Court reviews the record to determine whether that proposed fact is disputed and, if so, whether any dispute is material.  The Court also rules on objections that one party makes to the other's proposed facts and sometimes includes a proposed fact as modified by a meritorious objection.  Where appropriate, the Court includes facts drawn from its own review of the record.  Fed. R. Civ. P. 56(c)(3).

The Court also excludes immaterial proposed facts.  Because plaintiff dismissed her Title VII and Section 1981 race discrimination/retaliation claims, GPC's proposed facts relating to those claims (DSMF ¶¶ 4, 37) are not included. Moreover, given plaintiff's dismissal of her racial bias claims, and the fact that her Complaint never alleged sex discrimination, the Court excludes those portions of plaintiff's proposed facts mentioning race and/or sex.  (See PSMF ¶¶ 1-9, 11, 38.) Plaintiff also includes a number of proposed facts about a meeting on April 30, 2008. However, she made no claims in the First Amended Complaint arising out of that meeting (nor could she, given that it occurred more than 180 days before the filing of her March 2009 charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC")).[2]  Thus, the Court excludes proposed facts related to that meeting and the subsequent complaint plaintiff filed about it with GPC's Workplace Ethics Department.  (See PSMF ¶¶ 18-37; see also DSMF ¶ 34.)  Finally, as discussed infra, the Court excludes other immaterial proposed facts or proposed facts that are unsupported by the record citation provided.  See N.D. Ga. R. 56.1(B)(1).

### A.  Plaintiff's Position and Relevant GPC Personnel

Plaintiff worked as a Customer Service Representative ("CSR") in GPC's Macon, Georgia office from 2001 until June 2009.  (DSMF ¶ 1; R-DSMF ¶ 1; see also PSMF ¶ 1 (as modified per R-PSMF ¶ 1); PSMF ¶ 16; R-PSMF ¶ 16.)  During the time relevant to these claims, Mamie Mobley[3] served as the CSR Supervisor over plaintiff and other CSRs.[4]  (PSMF ¶ 2; R-PSMF ¶ 2.)  Ms. Mobley reported to

---

[2] See Jordan v. City of Montgomery, 283 F. App'x 766, 767 (11th Cir. 2008) (per curiam) ("In a non-deferral state . . . a plaintiff must file an employment discrimination charge with the EEOC within 180 days after the date of the alleged discrimination.").

[3] The Court excludes as immaterial plaintiff's proposed facts about the date and age at which Ms. Mobley began working for GPC.  (See R-PSMF ¶ 2.)

[4] Persons who served as CSRs included, inter alia, Jan Edwards (Senior CSR), Catherine Smith Cole, Nonna Horton, Tommy Calhoun, and Calandra Grouse. (PSMF ¶¶ 3-6, 14-15; R-PSMF ¶¶ 3-6, 14-15.)  The Court excludes as immaterial

Deborah Harrison, who served as Central Region Customer Service Manager.  (<u>Id.</u>; <u>see also</u> PSMF ¶ 8; R-PSMF ¶ 8.)  GPC employed Donna Ellis as a Staff Human Resources Consultant; she was responsible for human resources ("HR") needs within the Central Region, including compensation, benefits, training, and HR policies. (PSMF ¶ 7; R-PSMF ¶ 7.)

### B.    The Meeting of September 12, 2008

The record reflects three events in early-September 2008 which led to a critical meeting on September 12, 2008.  The first event occurred on or about September 5, 2008.[5]  On that date, Ms. Edwards informed Ms. Harrison that a temporary employee had complained to her that Ms. Mitchell was rude to all temporary employees and treated them disrespectfully, to the point that they believed that her misbehavior was some form of initiation or hazing.  (Harrison Decl. [51-11] ¶ 9; <u>see also</u> Edwards Decl. ¶ 5.)  Ms. Harrison then met with each of the three temporaries to investigate that claim; all of the temporaries confirmed this report of Ms. Mitchell's inappropriate behavior.  (Harrison Decl. ¶ 9.)

─────────────

a summary of Ms. Edwards's job duties (PSMF ¶ 3, third sentence) and evidence of plaintiff's past good job performance (<u>id.</u> ¶ 17).

[5] Ms. Mobley was on a temporary assignment during that time period; thus, Ms. Edwards was acting CSR Supervisor.  (<u>See</u> Edwards Decl. [51-10] ¶ 3.)

The second event occurred on September 8, 2008, when Ms. Mitchell called in sick.  (Edwards Decl. ¶ 6.)  Ms. Edwards called Ms. Mitchell on both her home and cell phones and left messages requesting that she contact her to let her know where she had placed the extra cash box key.  (Id.)  Ms. Mitchell did not return Ms. Edwards's call.  (Id.)  At approximately 6:13 p.m. that evening, Ms. Edwards called Ms. Mitchell again and finally reached her.  (Id.)  Ms. Mitchell stated that she had already had her husband call one of the CSRs to tell her where the key was.  (Id.)  Ms. Edwards interpreted Ms. Mitchell's actions as indicating that she did not feel the need to respond to her direct requests.  (Id.)  Ms. Edwards also reported this incident to Ms. Harrison.  (Id.; see also Harrison Decl. ¶ 10.)

The third event occurred on September 9, 2009, when Ms. Ellis provided Ms. Harrison with a report on Ms. Mitchell's attendance record.  (Harrison Decl. ¶ 11.) Through that date, Ms. Mitchell had already incurred more than eleven days of non-FMLA absences.  (Id.; see also Ellis Decl. [51-12] ¶ 14.)  While GPC's policies grant employees a certain amount of paid sick time, Central Region management counsels and disciplines employees for non-FMLA-related absences if they exceed a certain number.  (Ellis Decl. ¶ 14.)  Ms. Harrison and Ms. Ellis agreed that Ms. Mitchell

8

should be placed on the first level of discipline (an oral reminder) for her attendance. (Id.)

On September 12, 2008, Ms. Harrison called a meeting with Ms. Mitchell to discuss these behavior issues, to clarify expectations about her communications with her acting supervisor (Ms. Edwards), and to place her on the first level of discipline (an oral reminder) for attendance problems. (Harrison Decl. ¶ 12; see also Ellis Decl. ¶ 15.)[6] Also present at this meeting were Ms. Edwards and Ms. Ellis. (Harrison Decl. ¶ 12; see also Ellis Decl. ¶ 15.)

Ms. Ellis, Ms. Edwards, and Ms. Harrison included paragraphs about this meeting in their Declarations (see Ellis Decl. ¶ 15; Edwards Decl. ¶ 8; Harrison Decl. ¶¶ 13-15), and Ms. Ellis and Ms. Harrison testified about it in their depositions (see Ellis Dep. [56] 73-84; Harrison Dep. Vol. II [54] 25, 42-50.) Using Ms. Ellis's notes of that meeting as a guide (see Ellis Decl. ¶ 15 & Ex. D; see also Mitchell Dep. Ex. 14 [52-1] 68-70), GPC asked Ms. Mitchell about the meeting at her deposition (see Mitchell Dep. [52] 87-118). In addition, Ms. Mitchell made some averments about

---

[6] A document memorializing the oral reminder that management planned to administer to Ms. Mitchell for attendance is attached as Exhibit C to Ms. Ellis's Declaration. (See Ellis Decl. 32-34.)

the meeting in her Declaration (see Mitchell Decl. ¶¶ 4-6), and she proposed a number of facts about it as well (see PSMF ¶¶ 38-48).

Upon review of all these materials, and considering the evidence in a light most favorable to plaintiff, there are numerous disputes over the details of this meeting. However, most of those disputes are immaterial. The undisputed facts, given Ms. Mitchell's concessions during her deposition (discussed below), are that about forty-five minutes into the meeting, (1) plaintiff began crying, (2) said that she was depressed, and (3) asked for help. (DSMF ¶ 2; see also Mitchell Dep. 88, 105-106, 108-110.)[7]

With regard to the first item, Ms. Mitchell admitted that she shed tears, but denied "boohooing," and asserted that she cried only because of the way she felt that she was being treated during the meeting. (Mitchell Dep. 88-89, 104-105, 108,

---

[7] Given that the record cited supports DSMF ¶ 2, and the Court includes plaintiff's explanations for her conduct and statements in that meeting infra, the Court overrules plaintiff's objection. (See R-DSMF ¶ 2.)

111.)[8] Nevertheless, it is undisputed that, for whatever reason, plaintiff began crying during the meeting.

With regard to the second item, Ms. Mitchell's testimony varied. She first agreed that she had told her own psychologist (Dr. Ellison Cale) that she had cried in the meeting and was depressed when she was crying. (Mitchell Dep. 88.) She then added that she became depressed because of the way that she felt she was being treated during the meeting. (Id. at 88-89, 108-109.) She also asserted that she told her managers during the meeting that it was "depressing the way you all are treating me." (Id. at 109.) However, plaintiff conceded that she had said, "I am depressed." (Id.)[9]

With regard to the third item, Ms. Mitchell agreed that she may have said that she needed help. (Mitchell Dep. 106, 109.) Plaintiff testified that when she asked for help, she meant that she wanted someone to come to her aid at the meeting. (Id.)

---

[8] The alleged mistreatment included instances when Ms. Harrison allegedly raised her voice and pounded her fist on the table, aggressive interrogation without allowing plaintiff to explain her side of the story, and an instance when Ms. Ellis allegedly mocked Ms. Mitchell's faith. (Mitchell Dep. 89, 107; PSMF ¶¶ 38-40, 42; Mitchell Decl. ¶ 4.) The Court overrules defendant's objections to PSMF ¶¶ 38-40, 42. (See R-PSMF ¶¶ 38-40, 42.)

[9] Given the above summary of plaintiff's testimony, the Court excludes PSMF ¶¶ 41 and 43, portions of which are not supported by the record cited.

11

However, plaintiff agreed that, because she never expressed that subjective meaning to her managers, they apparently understood her request for help in a manner that she had not intended.  (Id. at 109-110.)

After plaintiff began crying and made these comments about being depressed and needing help, Ms. Harrison and Ms. Ellis gave her a few minutes to regain her composure, and then asked her if she needed to step into the ladies' room.  (Mitchell Dep. 111.)[10]  Ms. Mitchell accepted that offer and when she returned, the managers moved her to a private conference room.  (Id.)[11]

Both Ms. Harrison and Ms. Ellis were concerned about what they perceived as Ms. Mitchell's emotional outburst during the meeting.  (Ellis Decl. ¶ 15; Harrison Decl. ¶ 13.)  Thus, while Ms. Mitchell waited in that private conference room, Ms. Ellis contacted James Miller, who served as a supervisor in GPC's Disability Management Department, to discuss Ms. Mitchell's behavior and to request his

---

[10] By this time, Ms. Harrison had excused Ms. Edwards from the meeting. (Mitchell Dep. 108; see also Ellis Decl. ¶ 15; Harrison Decl. ¶ 13.)

[11] Plaintiff asserts that, after she returned from the ladies' room, she "was composed and twice requested to return to work," but Ms. Harrison refused those requests.  (PSMF ¶¶ 44-45.)  The Court discusses these assertions infra, where they more accurately flow in the chronology.

12

assistance.  (Ellis Decl. ¶ 15; <u>see also</u> PSMF ¶ 9; R-PSMF ¶ 9.)  According to Ms.

Ellis,

> I told Mr. Miller that during our meeting with Ms. Mitchell that day, Ms. Mitchell had an emotional outburst, crying, stating she was depressed, and asking for help.  I did not tell Mr. Miller that Ms. Harrison or I thought that Ms. Mitchell was a threat or posed a risk of violence.  Mr. Miller made the decision that Ms. Mitchell should be sent for a fitness for duty evaluation.

(Ellis Decl. ¶ 15; <u>see also</u> DSMF ¶ 3; R-DSMF ¶ 3.)[12]

Ms. Harrison and Ms. Ellis then returned to the private conference room where

Ms. Mitchell was waiting.  (Mitchell Dep. 112.)  Ms. Harrison informed plaintiff that

she must go for FDE before she could return to work.  (<u>Id.</u> at 113; <u>see also</u> Harrison

Decl. ¶ 15.)  Ms. Mitchell testified that she told Ms. Harrison that she did not know

what a FDE was.  (Mitchell Dep. 113.)  According to plaintiff, Ms. Harrison

responded, "You said that you were depressed." (<u>Id.</u>)[13] Ms. Mitchell replied that she

was fine and ready to go back to work.  (<u>Id.</u>)  However, Ms. Harrison replied that

---

[12] The Court overrules plaintiff's objection to the materiality of DSMF ¶ 3. (<u>See</u> R-DSMF ¶ 3.)

[13] Because PSMF ¶ 46 does not accurately summarize plaintiff's testimony on this point (<u>See</u> R-PSMF ¶ 46), the Court excludes it.

13

Ms. Mitchell would be taken to a clinic for a drug and alcohol test.[14]  (Id.)  Ms.

Mitchell protested, asserting that she was not on drugs.  (Id.)  Ms. Harrison

responded to plaintiff that if she refused the test, she would be terminated.  (Id.; see

also PSMF ¶ 47; R-PSMF ¶ 47.)  Ms. Harrison also stated that GPC would call her

when a doctor's appointment was scheduled.  (Mitchell Dep. 113.)

At that point, plaintiff asked to speak to Theresa Robinson, who was

summoned.  (Mitchell Dep. 114.)  Ms. Mitchell told Ms. Robinson that she did not

---

[14] A drug and alcohol test is part of the standard protocol at GPC for a FDE.
(See Miller Decl. [51-9] ¶ 6 & Ex. A ("Southern Company - Fitness for Duty
Policy").)  Under that Policy, refusal to submit to a requested FDE is grounds for
discharge.  (Id.)  Moreover, under that Policy,

> [d]uring the time in which the employee's ability to perform the
> essential functions of his or her position is evaluated and until a
> determination is made, the employee will be placed on paid
> administrative leave (unless the circumstances driving the fitness for
> duty evaluation require disciplinary action, in which case the
> administrative leave will be unpaid).

(Id.)  Although plaintiff asserts that she was placed on unpaid administrative leave
(see PSMF ¶ 50), the record actually shows that from September 12, 2008, to
January 2, 2009, she was on administrative leave, all of which was paid except for
two brief periods:  (1) September 24 to October 15 (the time when plaintiff did not
cooperate with Dr. Christopher J. Tillitski and failed to complete the required
assessment tools); and (2) November 2 to November 6 (when plaintiff was out of
work due to Dr. Tillitski's determination that she was not fit for duty, and before
plaintiff submitted a report from her psychologist that she was fit for duty).  (See R-
PSMF ¶ 50.)  The Court addresses both periods, infra.

understand why she was being ordered to take a FDE, but Ms. Robinson advised plaintiff that it would be in her best interest to comply with the protocol outlined in GPC's policies.  (Id. at 115-16.)  After Ms. Harrison took plaintiff's badge and keys, Ms. Robinson accompanied plaintiff to an off-site clinic for the drug and alcohol test (which was negative).  (Id. at 116; see also Ellis Dep. 84; PSMF ¶¶ 48-49.)[15]

### C.   The FDE and Related Events

Plaintiff attended a FDE with Dr. Tillitski, a licensed psychologist selected by GPC, on September 23, 2008 and October 16, 2008.  (DSMF ¶ 6; R-DSMF ¶ 6; see also PSMF ¶ 11.)  GPC required plaintiff to undergo this FDE, which included an examination by a psychologist, as a condition of her employment.  (PSMF ¶ 51, as modified per R-PSMF ¶ 51.)

### 1.   The September 23 FDE

At the appointment with Dr. Tillitski on September 23, Ms. Mitchell signed a "Consent and Statement of Understanding" form.  (Mitchell Dep. Ex. 15 [52-1]

---

[15] The Court overrules defendant's materiality objections to PSMF ¶¶ 48-49 (see R-PSMF ¶¶ 48-49), but notes that plaintiff incorrectly identified Ms. Harrison as accompanying her to the drug and alcohol test.

15

71.)[16]  After some initial questioning, the psychologist reportedly told Ms. Mitchell

that his receptionist would give her some paperwork to complete.  (Mitchell Dep.

126.)  There are immaterial disputes between the parties over why plaintiff did or did

not complete the questionnaires given to her.  (Compare PSMF ¶¶ 56-57, with R-

PSMF ¶¶ 56-57.)  It is undisputed, however, that plaintiff did not complete several

of the assessment tools that Dr. Tillitski felt that he needed to make his evaluation;

thus, he could not issue a definitive determination regarding plaintiff's fitness for

duty.  (Tillitski Decl. [51-13] ¶ 4.)  As a result, the psychologist submitted a report

to GPC which found Ms. Mitchell to be unfit for duty.  (See Mitchell Dep. Ex. 16.)

---

[16] The Court sustains defendant's objection to the fact that plaintiff proposes
about this form (see PSMF ¶ 52), because the assertion contained therein is not
supported by the record cited.  (See R-PSMF ¶ 52.)  The Court also excludes PSMF
¶ 53, which quotes from Dr. Tillitski's initial report (Mitchell Dep. Ex. 16 [52-1] 72-
78), on the grounds that the portion which plaintiff quotes is hearsay and attributed
to someone at GPC named "Brenda Robinson," who has not been identified.  (See
R-PSMF ¶ 53.)  The Court further excludes PSMF ¶ 54 (asserting that plaintiff's
husband accompanied her to the appointment) as immaterial.  (See R-PSMF ¶ 54.)
Finally, the Court excludes PSMF ¶ 55, wherein plaintiff makes the hearsay assertion
that Dr. Tillitski told her that some unidentified person at GPC told him that she was
sent for a FDE for anger-management reasons.  (See R-PSMF ¶ 55.)

## 2.   <u>Events Following the September 23 FDE</u>

At the direction of GPC's Disability Management Department, Ms. Harrison

sent plaintiff the following letter dated September 26, 2008:

> The results of the fitness for duty evaluation conducted on September 23, 2008, reveal you are presently not fit for duty and not able to return to work.
>
> Your absence, starting Friday, September 26, 2008 will be charged to FMLA–Family Medical Leave Act.  I am enclosing a copy of the Family Medical Leave Act which will explain what the Act covers.
>
> Starting September 26, 2008, your time will be charged to sick/disability/FMLA and will end on October 13, 2008.  After this date, your time will be charged to vacation/FMLA starting October 14, 2008 and ending October 22, 2008.  Once your vacation is exhausted, you will be placed on dock/FMLA, starting October 23,2008 and ending December 13, 2008.  December 13, 2008 ends the 12 week period that you are covered under FMLA.
>
> Your failure to become fit for duty or to have taken appropriate and reasonable measures, as recommended by Dr. Tillitski in his 9/23/08 report, by December 13, 2008, will result in your termination from GPC.
>
> Kathy Pickard is assigned to you as your Disability Case Manager.  It is your responsibility to contact Kathy by no later than 4:00 pm on Monday, September 29th.   Kathy's cell phone number is (xxx) xxx-xxxx.  It is also our expectation and your responsibility to fully cooperate with Kathy (follow recommendations and instructions) and to provide any and all requested information and documentation to her during your leave period.  Your failure to cooperate with Kathy will result in your termination from GPC.

Following a release to return to work by your health care provider(s), you will be re-evaluated by Dr. Tillitski.

(Harrison Decl. ¶ 17 and Ex. A thereto; <u>see also</u> Mitchell Dep. Ex. 39 [52-2] 54; PSMF ¶ 13 (identifying Ms. Pickard; defendant's objection, <u>see</u> R-PSMF ¶ 13, overruled).)

On Friday, October 3, 2008, Ms. Harrison sent another letter to Ms. Mitchell, which provides in relevant part as follows:

You are scheduled to see Dr. Ahmadi on October 9, 2008 at 11:45 AM. Address: 754 1st Street, Suite 101 Macon, GA 31201.  Phone number: xxx-xxx-xxxx.

The following requirements are in place regarding your medical care:

1.  You will attend all scheduled appointments.  Any cancellations or changes in appointment date or time may be made by Dr. Ahmadi's office only.  If you need to change appointment date/time for medical reasons for you or your immediate family (spouse, children), documentation of the medical reason and doctor's office visit shall be presented to Dr. Ahmadi at your next scheduled appointment.  Failure to attend appointments or cancel any appointment without prior approval by Dr. Ahmadi shall be viewed as failure to comply.

2.  You will fax to me an attendance statement after each office visit with Dr. Ahmadi.  My fax secure fax number is xxx-xxx-xxxx. Statements shall be faxed to me within 24 hours after the office visit.

18

3.     Failure to comply with all written or oral tests, evaluations, or appropriate or reasonable treatment options shall be viewed as failure to comply as directed.

4.     If you are prescribed prescription or over-the-counter medications as part of your treatment plan, failure to obtain and/or take the medications as directed shall be viewed as failure to comply as directed.  If you occur side effects from medications prescribed by Dr. Ahmadi, you must notify her immediate to discuss alternate treatment options or other available medication that can be taken.

5.     If Dr. Ahmadi can not provide medical treatment options and needs to refer you to another medical provider, she will obtain prior approval from Disability Management before changing of services can occur.

6.     Payment of all bills, including co-pays or deductibles related to your treatment are your full responsibility.  Disability Management or Georgia Power is not responsible for the payment of your evaluation or treatment options.

7.     Kathy Pickard is assigned as your Disability Case Manager.  It is our expectation and your responsibility to fully cooperate and follow with her recommendations, instructions, and to provide any and all requested information and documentation to her during your leave period.  Your failure to cooperate with Kathy will result in your termination from Georgia Power Company.

(Mitchell Dep. Ex. 38 [52-2] 52.)[17]

_____

[17] Because the Court incorporates the October 3 letter's text, plaintiff's proposed facts regarding it are excluded.  (See PSMF ¶¶ 58-61.)  The Court agrees with GPC that, because the directives in the letter were rescinded, it is immaterial.  (See R-PSMF ¶¶ 58-61.)  However, the Court includes the letter for background

Following receipt of this letter, plaintiff hired attorney Debra Schwartz. (PSMF ¶¶ 10, 63.)[18]   On October 6, 2008, Ms. Schwartz sent an email to Ms. Harrison and Ms. Pickard which reads in pertinent part as follows:

> Please be advised that I represent Ms. Detra Mitchell.  It is my understanding that Georgia Power & the Southern Company has [sic] put Ms. Mitchell out of work alleging that she has a medical disability. I would like to know the basis for this action.  The Company does not have the right to force an employee to take medical leave.  Ms. Mitchell vehemently denies she is disabled and wants to return to work.  Since the Company has placed her out of work pending medical evaluations, Ms. Mitchell's absence should be charged to administrative leave with pay and not her vacation or sick leave.  Moreover, the demands made by the Company in the letter faxed to Ms. Mitchell late Friday are unreasonable and unacceptable.  What medications Ms. Mitchell will take is a matter up to her and her own physician.  Your demand that Ms. Mitchell pay for any medical treatment that the Company demands is absurd.  This is solely the responsibility of the Company.

> Ms. Mitchell did not knowingly and voluntarily sign the medical release papers that you presented to her.  Rather, she was threatened and intimidated into believing that she would be terminated on the spot. Please be on notice that Ms. Mitchell hereby WITHDRAWS HER CONSENT FOR THE COMPANY TO RECEIVE HER MEDICAL RECORDS.   Any attempt by Southern Company to obtain Ms. Mitchell's records as of today will constitute a violation of HIPAA.

---

purposes.  Finally, the Court excludes PSMF ¶ 62 as immaterial and cumulative.

[18] The Court overrules GPC's objections to these proposed facts.  (See R-PSMF ¶¶ 10, 63.)

(Mitchell Dep. Ex. 17 [52-1] 79.)[19]

Thereafter, on October 9, 2008, at the direction of the Disability Management Department, Ms. Harrison sent Ms. Mitchell the following letter:

> I am writing to address your current leave status and the letters you received dated September 26, 2008 and October 3, 2008.
>
> Based on your behavior at work including your actions and your statement to your manager and a HR Business Consultant on September 12 that you felt depressed, Georgia Power directed you to attend a fitness for duty evaluation with Christopher J. Tillitski, Ph.D., a licensed psychologist. You attended that evaluation on September 23, 2008, but Dr. Ti1litski subsequently reported to us that you failed to complete several of the assessment tools he needed to complete the evaluation. Specifically, you did not complete the Personal History Checklist for Adults, the NEO Five-Factor Personality Inventory and the Adult Neuropsychological Questionnaire. Because you did not comply with Dr. Tillitski's requests during the evaluation, Dr. Tillitski was unable to declare you fit for duty at that time.
>
> On October 3, 2008, you received a letter directing you to attend an appointment with Dr. Ahmadi on October 9 so that he could conduct a complete evaluation of your status and provide you with counseling, as appropriate. However, we have determined that you need to complete your fitness for duty evaluation with Dr. Tillitski before any further steps are taken. Therefore, we have canceled the appointment with Dr. Ahmadi for October 9, 2008.
>
> Instead, we expect you to return to Dr. Tillitski to complete any checklists, inventories, questionnaires, tests or interviews that be needs

---

[19] Given the Court's inclusion of the October 6 email from attorney Schwartz, the Court excludes plaintiff's proposed fact about it (PSMF ¶ 64).

21

in order to conduct a thorough evaluation of your fitness for duty. We have scheduled an appointment for you to see Dr. Tillitski on October 13, 2008 at 9:00 AM. As a reminder, Dr. Tillitski's practice is Behavior Medicine, LLC located at 3585 Vineville Avenue Macon, GA, phone (xxx) xxx-xxxx.

Because your attorney sent us a letter revoking any releases that you signed concerning your medical information, we will need you to sign the enclosed release so that we can obtain the results of the complete fitness for duty evaluation from Dr. Tillitski. This release must be returned to Kathy Pickard, RN at xxx-xxx-xxxx by Friday, October 10, 2008 at 5:00 PM, EST.

Please understand that this instruction expects that you present yourself for the appointment with Dr. Tillitski and that you comply with his requests so that he can complete his evaluation is a requirement of your employment.

You will be placed on administrative leave with pay until we receive the results of your evaluation from Dr. Tillitski. Moreover, the classification of your time that Debra Harrison outlined in her September 26 letter to you will be changed such that all of the time you have missed since you left work on September 12 will be charged to administrative leave with pay.

Please let me know whether you have any questions about the information in this letter. Otherwise, I will be in touch with you once we have received Dr. Tillitski's evaluation of your fitness for duty.

(Mitchell Dep. Ex. 18 [52-1] 82-83; see also Harrison Decl. ¶ 17 & Ex. B thereto.)[20]

---

[20] Given the Court's inclusion of the October 9 letter from Ms. Harrison, the Court excludes plaintiff's proposed facts about it. (See PSMF ¶¶ 65-68.)

On October 10, 2008, with the approval of her attorney, plaintiff signed a HIPAA Authorization for the Use and Disclosure of Health Information, which she provided to GPC.  (DSMF ¶ 10; R-DSMF ¶ 10.)

### 3.    The October 16 FDE and Dr. Tillitski's Report

Ms. Mitchell returned to Dr. Tillitski's office on October 16, 2008, and completed all of the remaining assessment tools during this second appointment. (Tillitski Decl. ¶ 5.)[21]  On October 21, 2008, Dr. Tillitski submitted a completed report to GPC on October 21, 2008, which concluded that Ms. Mitchell was not fit for duty.  (Id. ¶ 6; see also DSMF ¶ 7.)[22]  However, she was not an immediate threat to the safety and/or health of herself or others.  (Id. ¶ 7.)

On October 30, 2008, again at the instruction of the Disability Management Department, Ms. Harrison sent a letter to Ms. Mitchell which reads in relevant part as follows:

_____

[21] The Court agrees with GPC that plaintiff's subjective reasons for her compliance with the request that she return to Dr. Tillitski's office to complete the testing are immaterial.  (Compare PSMF ¶ 69, with R-PSMF ¶ 69.)  Dr. Tillitski's subsequent report erroneously lists the second round of testing as having occurred on November 16, 2008.  (Mitchell Dep. Ex. 40 [52-2] 55.)

[22] Although plaintiff denies that Dr. Tillitski concluded that was not fit for duty, see R-DSMF ¶ 7, the proposed fact is supported by the record cited.  Thus, the Court deems DSMF ¶ 7 undisputed.

As you know, Georgia Power requested that you attend a fitness for duty evaluation with Christopher J. Tillitski, Ph.D., a licensed psychologist. You began that evaluation on September 23, 2008, but because you failed to complete several of the assessment tools during that visit, you returned to Dr. Tillitski to complete that evaluation on October 16, 2008. We have now received the results of this evaluation and Dr. Tillitski informs us that you are not able to return to work at this time due to your inability to work with others. Of course, working with others is an essential function of your Customer Service Representative position.

In light of Dr. Tillitski's determination, we strongly encourage you to take whatever steps you and your health care provider deem necessary so that you will be fit for duty. Dr. Tillitski recommends mental health counseling, a thorough medical evaluation and possibly a psychiatric review if your symptoms of emotional distress do not subside. However, the decision of what treatment to seek and undergo is completely up to you and your health care provider. Similarly, any expenses associated with that treatment (including co-pays, deductibles and prescription medication costs) are your responsibility. When you and your health care provider believe that you are fit to return to duty, you will need to provide a fitness for duty certification from your health care provider. You will also be asked to complete another fitness for duty evaluation with Dr. Tillitski.

As I told you in my previous letter, you were placed on administrative leave with pay while you were being evaluated by Dr. Tillitski. Now that we have received the results of Dr. Tillitski's evaluation, you are being removed from administrative leave. Effective October 27, 2008, you will be placed on docked time status unless you would like to use your vacation time or sick time while you are out. In addition, if you would like to apply for leave under the Family and Medical Leave Act (FMLA), please complete the enclosed forms and return them to Kathy Pickard, your Disability Case Manager, as soon as possible. Ms. Pickard can also answer any questions you may have about the FMLA

24

process and protections.  If you would like for us to coordinate a request for Dr. Tillitski to complete the medical certification form, please contact Ms. Pickard at xxx-xxx-xxxx.

Please let me know whether you have any questions about the information in this letter.  I hope that the treatment you select is successful and that you are able to return to work fit for duty as soon as possible.

(Mitchell Dep. Ex. 20 [52-1] 89-90; see also Harrison Decl. ¶ 18 & Ex. C thereto.)[23]

Ms. Mitchell then retained a psychologist of her own, Dr. Cale, who tested her and submitted a report to GPC indicating that she was fit for duty.  (PSMF ¶¶ 12, 76-78 (defendant's objections, see R-PSMF ¶¶ 12, 76-78, overruled).)  GPC's counsel then provided plaintiff's counsel with a copy of Dr. Tillitski's final evaluation.  (PSMF ¶ 79 (defendant's objection, see R-PSMF ¶ 79, overruled).)[24]

_____

[23] Given the Court's inclusion of the October 30 letter from Ms. Harrison, the Court excludes plaintiff's proposed facts about it (PSMF ¶¶ 70-74).  The Court also excludes PSMF ¶ 75 (alleging that plaintiff requested a copy of the evaluation from Dr. Tillitski, but was refused) as immaterial.  (See R-PSMF ¶ 75.)

[24] The record reflects that Dr. Tillitski's reports and Dr. Cale's report were not circulated to any member of plaintiff's management team (Ms. Harrison, Ms. Mobley, or Ms. Edwards) or to anyone at Georgia Power who did not have a need to know.  (DSMF ¶ 8.)  Moreover, the record shows that no medical information about plaintiff was ever given to Ms. Harrison, Ms. Mobley, Ms. Edwards, or Ms. Ellis during plaintiff's employment.  (Id. ¶ 9.)  Although some of Ms. Harrison's letters to plaintiff reference directives found in Dr. Tillitski's reports (see R-DSMF ¶¶ 8-9), it is undisputed that GPC's Disability Management Department prepared those letters for her signature.  Thus, the Court deems DSMF ¶¶ 8-9 undisputed.

25

On December 8, 2008, plaintiff's counsel sent an email to GPC's counsel requesting that Ms. Mitchell be allowed to return to work because neither psychologist had found that she was a threat to herself or to others.  (See PSMF ¶¶ 80-81 (defendant's objections, see R-PSMF ¶¶ 80-81, overruled).)  Plaintiff's counsel also threatened in that email to file a charge of discrimination if her client were not reinstated.  (PSMF ¶ 82; R-PSMF ¶ 82.)

GPC's Medical Director told GPC that he was not opposed to allowing plaintiff to return to work after he reviewed the report of Dr. Tillitski and the report of plaintiff's psychologist.  (DSMF ¶ 11; R-DSMF ¶ 11.)  Accordingly, in a letter dated December 10, 2008, GPC's counsel informed plaintiff's counsel as follows:

> Georgia Power has decided to allow Ms. Mitchell to return to work. However, Ms. Mitchell needs to understand that she–like all employees of Georgia Power–will be held accountable for her conduct, actions and statements in the workplace.  If she engages in behavior that is improper, disruptive, insubordinate or interferes with her co-workers' performance of their jobs (as has happened in the past), Georgia Power will have no choice but to take appropriate action, which may include performance management and discipline. In addition, Ms. Mitchell will return to work at the same point in her performance management history where she left off.  During the meeting on September 12, Ms. Mitchell was being counseled regarding her workplace behavior and she was to receive an oral reminder for her prior attendance problems. However, due to Ms. Mitchell's behavior and statement during the meeting (as described above), Ms. Mitchell's manager suspended the meeting and sent Ms. Mitchell home pending a fitness for duty

26

> evaluation.  Consequently, when Ms. Mitchell returns to work, Ms. Mitchell's management and an HR consultant plan to sit down with her to discuss these pending issue and the Company's expectations concerning her behavior and her attendance going forward as an employee of Georgia Power.

(Mitchell Dep. Ex. 22 [52-1] 94.)  The letter concluded with a request that Ms. Mitchell meet with Ms. Harrison on January 2, 2009, and that she plan to return to work on Monday, January 5, 2009.  (Id. at 95.)[25]

A former GPC employee named Cathie Smith Cole avers that Ms. Harrison held a meeting with the CSRs and informed them that Ms. Mitchell was returning to work.  (Cole Decl. [68-1] ¶ 35.)  Ms. Cole asserts that Ms. Harrison told her that she was not to worry because if Ms. Mitchell made "one wrong move she was 'outta here.'"  (Id.)[26]

---

[25] Given the Court's inclusion of the letter from GPC's counsel, the Court excludes plaintiff's proposed fact about it.  (See PSMF ¶ 83.)

[26] Given the Court's inclusion of the averment from Ms. Cole's Declaration, the Court excludes plaintiff's proposed facts about it (PSMF ¶¶ 84-86) and overrules defendant's objections (see R-PSMF ¶¶ 84-86) that the fact contained in that averment is immaterial.  Ms. Cole's Declaration also reflects that she and Ms. Mitchell had difficulty getting along, leading her to complain about plaintiff to management on several occasions.  (Cole Decl. ¶¶ 28-31.)

27

### D.     Ms. Mitchell's Return to Work

Plaintiff returned to GPC's offices on Friday, January 2, 2009.  (DSMF ¶ 12; R-DSMF ¶ 12.)  On that date, Ms. Harrison, Ms. Ellis, and Ms. Mobley met with her.  (PSMF ¶ 87; R-PSMF ¶ 87.)   The purpose of the meeting was to set GPC's expectations for Ms. Mitchell's performance upon her return to work.  (PSMF ¶ 88 (as modified per Ellis Dep. 113).)[27]  At this meeting, GPC issued plaintiff a multi-page document described as an "Oral Reminder" and captioned, "Behavioral Issues and Expectations."  (PSMF ¶ 90 (as modified per R-PSMF ¶ 90); see also Harrison Dep. Vol. II Ex. 3 [54-1] 1-6.)  This document listed both the poor behaviors that Ms. Mitchell had exhibited in the past and the positive behaviors that management expected from her upon her return.  on a go-forward basis.  (See Harrison Dep. Vol. II Ex. 3 [54-1] 1-6.)  Plaintiff resumed working as a CSR on Monday, January 5, 2009.  (PSMF ¶ 89; R-PSMF ¶ 89.)

### E.     Plaintiff's EEOC Charge

On March 9, 2009, plaintiff filed a charge of discrimination with the EEOC alleging, inter alia, discrimination and retaliation in violation of the ADA.  (PSMF

---

[27] The Court overrules GPC's objection that PSMF ¶ 88 is immaterial.  (See R-PSMF ¶ 88.)

28

¶ 91; R-PSMF ¶ 91.)  Following that date, both Ms. Ellis and Ms. Harrison received notice of the EEOC charge.  (PSMF ¶ 92; R-PSMF ¶ 92.)

**F.    Force Balancing**[28]

At the end of each workday, a CSR must balance the cash, checks, and money orders received that day against the amount that the computer system shows was credited to the customers' accounts–if these two amounts match, the CSR is considered to be "in balance," and if these two amounts do not match, the CSR is considered to be "out of balance."  (DSMF ¶ 14; R-DSMF ¶ 14.)  If the CSR is "out of balance" and the money she has does not match what the computer system says she should have, the CSR must report this fact to her supervisor prior to closing out of the computer system.  (DSMF ¶ 15; R-DSMF ¶ 15.)

GPC asserts that, "[u]nder no circumstances is a [CSR] who is out of balance permitted to 'force balance' by adjusting the amount of cash in her cash drawer or bank deposit by making an adjustment to the cash reported in the system to make the figures match."  (DSMF ¶ 16.)  According to GPC, "[i]f a [CSR] is out of balance at

---

[28] The record reflects use of both "force balancing" and "forced balancing" as equivalent terms.

29

the end of the day, but closes out of the computer system showing that she is in balance, the [CSR] has force balanced."  (Id. ¶ 17.)

GPC's policies strictly prohibit "force balancing."  (DSMF ¶ 18; R-DSMF ¶ 18; see also PSMF ¶ 93; R-PSMF ¶ 93.)  Those policies include the Internal Cash Security Statement and Customer Service Standard 10.2.  GPC required plaintiff as a CSR to follow both policies.  (DSMF ¶ 13; R-DSMF ¶ 13.)[29]  Paragraph 15 of Internal Cash Security Statement provides as follows:

> Cash Reports should be balanced using the process outlined in the Customer Service Standards.  Cash Reports that do not balance should be reported as out of balance.  Under no circumstances should a Cash Report be forced to balance by any means.  (Refer to Standard 10.2 for a definition of Forced Balancing.)

(Harrison Decl. Ex. G.)  Customer Service Standard 10.2 states in relevant part as follows:

> **Do Not Force Balance**.  Force Balancing is any invalid/artificial adjustment to Cash or a Customer's Credit to make a cash report balance.

(Id. Ex. F.)

---

[29] The Court excludes PSMF ¶ 94 because it does not accurately quote Customer Service Standard 10.2.  (See R-PSMF ¶ 94.)  The Court also excludes PSMF ¶ 95 because it is not supported by the record citation provided.  (See R-PSMF ¶ 95.)  The Court further excludes PSMF ¶¶ 96-97, which relate to "outages," on the ground that they are immaterial.  (See R-PSMF ¶¶ 96-97.)

Ms. Mitchell denies GPC's description of force balancing as reflected in DSMF ¶¶ 16-17 (supra).  In identical denials, plaintiff asserts as follows:

> The policy states that forced balancing is when any "invalid/artificial adjustment to the Cash or a Customer's Credit to make a cash report balance."  (Defendant's Exhibit 46 to Plaintiff's Dep.; see also Plaintiff's Decl. at ¶ 9; Mobley Dep. p. 31; Cole Decl. at ¶ 14).  Prior to Plaintiff's termination "forced balancing" has always been interpreted to mean that a customer service representative cannot put money from an outside source including his or her own money or remove money from the cash fund in order to make it balance.  (Id.)

(See R-DSMF ¶¶ 16-17.)  For the reasons explained below, these denials are without merit.

In the first sentence of that denial, plaintiff accurately quotes the definition of "force balancing" from Customer Service Standard 10.2.  However, that definition must be considered in light of the Internal Cash Security Statement, which states that, "[u]nder no circumstances should a Cash Report be forced to balance by any means."  (Harrison Decl. Ex. G.)

In the second sentence of that denial, plaintiff asserts that, before her termination "'forced balancing' has always been interpreted to mean that a customer service representative cannot put money from an outside source including his or her own money or remove money from the cash fund in order to make it balance."  (R-

31

DSMF ¶¶ 16-17) (emphasis added).[30]  Plaintiff supports this assertion by citing her

Declaration, the Mobley Deposition [55], and the Cole Declaration.   However,

nothing at the cited page (31) of Ms. Mobley's deposition transcript supports any

contention that force balancing has always been interpreted to mean that a CSR

cannot put money from an outside source including his or her own money or remove

money from the cash fund in order to make it balance.[31]   Similarly, Ms. Cole's

---

[30] A CSR could engage in force balancing by putting money from an outside source (including her own money) into her cash or by removing money from her cash, either of which could make her drawer balance.  However, Ms. Harrison (the decisionmaker), the Internal Auditors, and the Workplace Ethics representative that Ms. Harrison asked to investigate plaintiff's activities all understood the concept of force balancing to be much broader than that.  (See Harrison Dep. Vol. II 4-5, 66-68, 71; Harrison Decl. ¶¶ 24-30; Palmore Decl. [51-4] ¶ 7 (an internal auditor); Molock Decl. [51-8] ¶ 7 (workplace ethics representative).)  Indeed, their understanding is consistent with the admonition found in the Internal Cash Security Statement: "Under no circumstances should a Cash Report be forced to balance by any means." (Harrison Decl. Ex. G.)

[31] Ms. Mobley simply agreed with the proposition that a CSR who used $100 of her own money to make her drawer balance had engaged in force balancing. (Mobley Dep. 31.)

32

Declaration makes no mention of how force balancing has always been interpreted.[32]

Thus, the only support for this assertion comes from Ms. Mitchell's Declaration.

The Court concurs with that portion of GPC's Motion to Strike which challenges paragraph 9 of Ms. Mitchell's Declaration as lacking in personal knowledge.  (See Mem. Supp. Def.'s Mot. to Strike [76-1] 8-10; Reply in Supp. of Def.'s Mot. to Strike [88] 4.)[33]   Ms. Mitchell cannot possibly have personal knowledge of how all managers at GPC have always interpreted the offense of force balancing in all situations.  Therefore, the Court **GRANTS** defendant's Motion in part and strikes the offending sentence from paragraph 9 of plaintiff's Declaration.[34]

---

[32] Instead, Ms. Cole asserts that GPC taught her that "forced balancing was the adjusting of cash in her drawer or bank deposit in order to make the figures match." (Cole Decl. ¶ 14.)  She adds that she "never was told that forced balancing was when you made an adjustment to the cash reported in the system to make the figures match."  (Id.)  However, Ms. Cole's limited understanding of what constitutes force balancing is immaterial.

[33] Because defendant challenges an affidavit and not a pleading, GPC should have filed a notice of objection to the challenged testimony, not a motion to strike. Jordan v. Cobb Cnty., Ga., 227 F. Supp. 2d 1322, 1346 (N.D. Ga. 2001).  The Court overlooks this minor procedural error to reach the merits.

[34] The Court also excludes PSMF ¶¶ 98-99 and 102 because they make the same assertion found in paragraph 9 of plaintiff's Declaration.  In PSMF ¶ 100, plaintiff asserts that the stricken definition of force balancing was the "applicable definition used by Mobley in discussing forced balancing with her customer service representatives."  Nothing in the cited paragraph of Ms. Mitchell's Declaration (¶ 9)

33

See Polite v. Dougherty Cnty. Sch. Sys. 314 F. App'x 180, 183 (11th Cir. 2008)

(allegations in affidavit not based on personal knowledge inadmissible on summary

judgment per Fed. R. Civ. P. 56(e)(1)).   Given that plaintiff's denials are

unsupported, and several GPC managers provided deposition testimony and

Declarations supporting a broader view of force balancing than asserted by plaintiff,

the Court deems DSMF ¶¶ 16-17 admitted.

------

or the cited page of Ms. Mobley's deposition (p. 31) supports that assertion.  Of the
multiple paragraphs of Ms. Cole's Declaration cited in support of PSMF ¶ 100, the
only one arguably related reads as follows:

> [] Mamie Mobley questioned me during the time that Detra Mitchell
> was terminated if I knew what forced balancing was.  I told her that is
> when a [CSR] puts money in or takes money out of her cash funds or
> places money into her funds so that the amount of the funds to be
> deposited matches her system deposit slip.  Mobley agreed with my
> response and did not tell me that forced balancing could be anything
> else.

(Cole Decl. ¶ 16.)  Even if Ms. Mobley agreed with Ms. Cole's description of how
a CSR might engage in force balancing, and did not discuss at that time any other
ways that force balancing could occur, it matters not because, as previously
discussed, the broader understanding of force balancing held by the decisionmaker
(Ms. Harrison), the internal auditor (Ms. Palmore), and the workplace ethics
investigator (Ms. Molock) is the relevant one.  Thus, the Court excludes PSMF ¶
100.  The Court also excludes PSMF ¶¶ 101 and 103 as unsupported by the record
cited.  Finally, the Court excludes PSMF ¶ 104 as vague, unclear, and unsupported
by the record cited.

34

**G.    GPC's Issues With Plaintiff's Job Performance**

When Ms. Mitchell closed out her drawer at the end of the day on May 5, 2009, GPC's computer system showed that she had entered into the system that she had collected $2,664.51 in cash from customers paying their bills.  (DSMF ¶ 19, first sentence (not disputed by plaintiff).)   When plaintiff counted the cash she had actually collected, she discovered that she had ten dollars more than she had entered into the system, or $2,674.51.   (Id., second sentence (not disputed by plaintiff).)  Therefore, plaintiff was out of balance at the end of the day on May 5, 2009.  (Id., third sentence.)[35]  Nevertheless, Ms. Mitchell entered into the computer system and on her deposit slip that she was depositing $2,664.51 into the bank and indicated on the system that she was "in balance."  (DSMF ¶ 20; R-DSMF ¶ 20.)

On May 11, 2009, Senior CSR Edwards informed Ms. Mobley that, on May 5, 2009, Ms. Mitchell had reported that she was in balance when she was, in fact, out of balance.  (Mobley Decl. [51-6] ¶ 14.)  That same day, Ms. Mobley called Ms.

---

[35] Plaintiff disputes the third sentence of DSMF ¶ 19, asserting that she "believed that she was in balance at the time she completed her work at the end of the day, and did not find out she was out of balance until she was notified by Mobley."  (R-DSMF ¶ 19.)  Because plaintiff agrees that she was out of balance on May 5–which is the fact proposed by GPC–the Court deems the third sentence of DSMF ¶ 19 admitted.

Mitchell into her office to discuss the balancing process on May 5. (Id. ¶ 15.) Ms. Mobley informed Ms. Mitchell that she had learned that Ms. Mitchell was $10 over on May 5, but that she did not show that she was out of balance on her cash report that day. (Id.) Ms. Mobley told Ms. Mitchell that it looked as if she had force balanced. (Id.) She asked Ms. Mitchell if she knew what force balancing meant, and plaintiff responded that she did and insisted that she did not force balance. (Id.) Ms. Mobley explained force balancing to Ms. Mitchell anyway. (Id.) Ms. Mobley then told plaintiff that she should not enter into the computer system the amount the system showed she should have, but that she needed to enter the amount that she actually counted. (Id.) Ms. Mobley also advised Ms. Mitchell to pay attention to the balancing aids provided in the computer system, and Ms. Mitchell agreed that she would pay closer attention. (Id.) Ms. Mobley avers that she did not report this incident to Ms. Harrison at the time because she was not sure whether it was force balancing. (Id.)

On May 13, 2009, Ms. Edwards provided plaintiff with written instructions on how to correct the May 5 deposit, which stated that "CSR's will be over." (DSMF ¶ 21; R-DSMF ¶ 21.) At the end of the day on May 13, 2009, after making the

36

correction as Ms. Edwards instructed, plaintiff showed herself as being "in balance" on the computer system.  (DSMF ¶ 22; R-DSMF ¶ 22.)

On May 21, 2009, Ms. Edwards informed Ms. Mobley that she had discovered that when Ms. Mitchell made the correction to the May 5, 2009, deposit on May 13, 2009, she should have shown that she was out of balance by $10 for May 13, but instead she showed that she was in balance.  (Mobley Decl. ¶ 16.)  Ms. Mobley decided to discuss plaintiff's apparent force balancing on May 13, 2009, with Ms. Harrison.  (Id.)  However, over the course of the next week, she was unable to meet with Ms. Harrison about the mater because of vacation schedules and meetings out of the office.  (Id.)

On May 27, 2009, plaintiff counted her cash and found that she had $3,228.36. However, she entered into the computer system and on her deposit slip that she was depositing $3,328.36 into the bank.  (DSMF ¶ 23; R-DSMF ¶ 23.)  On May 27, 2009, plaintiff closed out of the computer system at the end of the day reporting that she was "in balance" when, in fact, she was "out of balance."  (DSMF ¶ 24.)[36]

_____

[36] Plaintiff disputes DSMF ¶ 24, asserting that she "believed that she was in balance at the time she completed her work at the end of the day, and did not find out she was out of balance until she was notified by Mobley." (R-DSMF ¶ 24.) Because plaintiff agrees that she was out of balance on May 27–which is the fact proposed by GPC–the Court deems DSMF ¶ 24 admitted.

On May 29, 2009, Ms. Edwards informed Ms. Mobley that she had discovered that on May 27, 2009, plaintiff had again reported that she was in balance when she was, in fact, out of balance.  (Mobley Decl. ¶ 17.)  On June 5, 2009, Ms. Edwards and Ms. Mobley met with Ms. Mitchell to discuss the $100 out-of-balance report from May 27, 2009.  (Id. ¶ 18.)  Ms. Mobley showed Ms. Mitchell documentation pertaining to that out of balance, focusing on the paperwork which showed that Ms. Mitchell should have reported out of balance by $100 instead of reporting in balance. (Id.)  Ms. Mobley asked Ms. Mitchell if she needed help with the balancing process, but she responded that she did not need help, that she felt confident in what she was doing, and that she needed to take her time.  (Id.)

On June 5, 2009, Ms. Mobley reported to Ms. Harrison that it appeared that plaintiff had force balanced on three separate occasions in May 2009–each time reporting that she was in balance when she was not.  (DSMF ¶ 25; R-DSMF ¶ 25.)[37]

─────────────────

[37] Plaintiff asserts that it is apparent that GPC broadened the definition of force balancing because Ms. Mobley did not report the incidents of May 5 and May 13 because she was not certain that Ms. Mitchell had engaged in force balancing. (See PSMF ¶ 105.)  However, that assertion is not supported by the cited testimony.  Ms. Mobley actually testified that she did not initially report the incident on May 5 because she was unsure if it constituted force balancing.  (Mobley Dep. 100.) Nevertheless, Ms. Mobley counseled Ms. Mitchell as soon as she learned of the May 5 incident for what appeared to be force balancing.  After Ms. Mobley learned about the second incident of force balancing, but before she could meet with Ms. Harrison

Ms. Harrison and Ms. Ellis decided to contact GPC's Internal Auditing Department to request that they investigate plaintiff's apparent force balancing.  (DSMF ¶ 26; R-DSMF ¶ 26.)

In early-June 2009, two auditors from GPC's Internal Auditing Department reviewed plaintiff's cashier tapes, cash reports, bank deposits, and bank deposit reports for May 5, 13, and 27, and interviewed plaintiff and Senior CSR Edwards. (DSMF ¶ 27; R-DSMF ¶ 27.)  The internal auditors told Ms. Ellis that they believed plaintiff had engaged in "classic force balancing."  (DSMF ¶ 28; R-DSMF ¶ 28.)[38]

Based on the determination by the Internal Auditing Department that plaintiff had force balanced, and Ms. Harrison's understanding that force balancing is a terminable offense, she decided to terminate plaintiff's employment.  (DSMF ¶ 29; R-DSMF ¶ 29.)  Ms. Harrison never indicated to plaintiff that she thought plaintiff was disabled, and Ms. Harrison never thought that plaintiff had a mental or physical impairment or that she was substantially limited in any major life activity.  (DSMF

to discuss it, Ms. Mitchell force balanced a third time.  (Mobley Decl. ¶¶ 16-18.)

[38] Ms. Harrison and Ms. Ellis asked Jo Molock from GPC's Workplace Ethics Department to review the Internal Auditing report.  (Molock Decl. ¶ 7.)  After reviewing that report, Ms. Molock informed Ms. Ellis that she also believed Ms. Mitchell had engaged in force balancing.  (Id.)

AO 72A
(Rev.8/82)

¶ 30; R-DSMF ¶ 30.)  GPC terminated plaintiff on June 10, 2009.  (Harrison Decl. ¶ 30.)

Ms. Harrison stated both in her deposition testimony and in her Declaration that she believes force balancing to be a terminable offense, and that it is GPC's consistent practice to terminate any employee who engages in it.  (DSMF ¶ 32.)[39] Ms. Harrison is not aware of anyone at GPC who has been found to have force balanced who has not been terminated.  (Id. ¶ 33.)[40] Indeed, Ms. Harrison terminated plaintiff the first time she became aware that she had force balanced, based on her

---

[39] The Court excludes PSMF ¶ 106, which asserts that plaintiff was the first person ever terminated for force balancing, as unsupported by the record cited.  (See R-PSMF ¶ 106.)  The record shows instead that Ms. Mitchell was the first person that Ms. Harrison had ever terminated for force balancing.  (Harrison Dep. Vol. I [53] 143.)  Ms. Harrison subsequently terminated Ms. Cole for force balancing in October 2009.  (Id. at 143-44; see also DSMF ¶ 31.)  Given her limited understanding of force balancing, Ms. Cole asserts that she did not engage in that practice.  (See R-DSMF ¶ 31.)  The Court excludes PSMF ¶ 107 cumulative, but includes infra the similar assertion made in PSMF ¶ 108.

[40] Plaintiff denies the statement preceding this note, asserting that Ms. Harrison could not identify anyone other than plaintiff who had been terminated for force balancing.  (See R-DSMF ¶ 33.)  However, that assertion misstates the record.  Ms. Harrison identified two persons terminated for force balancing–plaintiff and Ms. Cole.  (Harrison Dep. Vol. I 143-44.)  Thus, it is undisputed that Ms. Harrison has terminated every employee whom she believed engaged in force balancing.

40

understanding that one instance of force balancing results in termination.  (PSMF ¶ 108; R-PSMF ¶ 108.)[41]

Plaintiff disagrees with Ms. Harrison's decision to discharge her, asserting that (1) force balancing is not listed in GPC's policies as a terminable offense for the first infraction, (2) Ms. Harrison failed to follow GPC's written disciplinary policy, and (3) Ms. Harrison could not identify any document or individual who told her that she was required to terminate plaintiff.  (R-DSMF ¶ 32; see also PSMF ¶¶ 120-121, which echo assertion (3).)   None of these assertions create a disputed issue of material fact.

With regard to the first two contentions, GPC employs a "Positive Discipline Policy" to address employee performance problems.  (PSMF ¶ 111; R-PSMF ¶ 111; see also Pl.'s Ex. 2 [67-2] 3-15 (copy of Policy).)[42]  Although informal coaching, an

---

[41] Plaintiff argues that Ms. Harrison's understanding was contradicted by Ms. Ellis, who testified that there is no policy stating that force balancing must result in termination.  (See PSMF ¶ 109.)  Ms. Ellis actually testified that there is no written policy stating that force balancing must result in termination.  (Ellis Dep. 143-44.)  Ms. Harrison never relied on a written policy.  Thus, the Court excludes PSMF ¶ 109, because there is no contradiction in the testimony of Ms. Harrison and Ms. Ellis.  The Court also excludes PSMF ¶ 110, as the record plaintiff cites (Harrison Dep. Vol. II 57-58) fails to support it.

[42] Plaintiff summarizes some aspects of the Positive Discipline Policy in PSMF ¶¶ 112-114 and 115 (first sentence).  Although GPC objects to that summary

oral reminder, a written reminder, and a decision making leave ("DML") are progressive levels of discipline under that Policy, it contains the following provision that allows GPC to skip those steps:

> Employees may also be discharged at any time without receiving an Oral Reminder, a Written Reminder or a DML for serious infractions or violations of company policy, including, but not limited to, Insubordination, theft and violations of the Workplace Violence Policy, Drug and Alcohol Program Policy, Workplace Free of Harassment Policy, Arrest Reporting Policy and Electronic Communication Acceptable Use Policy.

(Pl.'s Ex. 2 [67-2] 8.)

Although "force balancing" is not listed as a terminable offense, the Policy provides that the list of conduct which may result in immediate discharge is non-exclusive.[43]   Moreover, plaintiff's claim that GPC failed to follow the Policy is

---

as immaterial and/or erroneous in some instances (see R-PSMF ¶¶ 112-114 and 115 (first sentence)), any disputes are immaterial.  However, the Court excludes the second sentence of PSMF ¶ 115 as factually unsupported. Ms. Harrison did not testify that employees who commit a zero-tolerance infraction must receive a DML. Instead, she said that a manager can automatically place an employee on a DML for violating the seat-belt policy because there is zero tolerance for not wearing a safety belt.  (Harrison Dep. Vol. I 121.)

[43] Given the Policy's terms, plaintiff's argument that force balancing is not included among the offenses subject to immediate termination is immaterial. (Compare PSMF ¶ 118, with R-PSMF ¶ 118.)  Similarly, plaintiff's assertion that Ms. Mobley could not remember if she had ever given plaintiff any oral reminders or how many is immaterial.  (Compare PSMF ¶ 119, with R-PSMF ¶ 119.)  The

incorrect, because GPC may–as allowed by the Policy–skip the oral reminder, written reminder, and DML and terminate an employee immediately if she commits a serious infraction or violation of its policies (which include Customer Service Standard 10.2 and/or the Internal Cash Security Statement).[44]

As for plaintiff's third contention, Ms. Harrison testified that, as long as she served as a CSR, she knew that force balancing was a terminable offense, and that while there is no written policy or directive expressing stating that force balancing automatically results in termination, it is something she learned through "word of mouth." (PSMF ¶¶ 120, 121 (first sentence); R-PSMF ¶¶ 120, 121 (first sentence).)[45]

---

proposed fact (i.e., PSMF ¶ 119) is also unsupported by the record cited. Ms. Mobley testified that she did not keep track of which employees she gave oral reminders or how often, but that she was sure she had given plaintiff at least one. (Mobley Dep. 87.)

[44] Thus, it is immaterial that plaintiff failed to receive a DML before her termination. (Compare PSMF ¶ 116, with R-PSMF ¶ 116.) Moreover, plaintiff misconstrues Ms. Harrison's testimony summarized in PSMF ¶ 117. The Positive Discipline Policy still applies to an employee who commits a serious infraction or violation of its policies, but she goes straight to discharge instead of through progressive discipline. (See R-PSMF ¶ 117.)

[45] The parties agree that the only conduct by plaintiff which led to her termination was force balancing. (PSMF ¶ 121 (second sentence); R-PSMF ¶ 121 (second sentence).) The Court excludes PSMF ¶ 122 as unsupported by the record cited. The Court also excludes PSMF ¶ 123 as argumentative and unsupported by the record cited. Plaintiff asserts (without citing the record) that Ms. Harrison

43

It is immaterial whether a policy is written or unwritten (i.e., learned through "word of mouth").  Moreover, the Positive Discipline Policy makes clear that one may be terminated on a first offense if the employer deems it a serious infraction.

### H.    Subsequent Actions by Nonna Horton

On January 21, 2010, Ms. Horton failed to show an outage of $21 on her end of day report.  (PSMF ¶¶ 124-125.)  However, as defendant correctly responds, this fact is immaterial as Ms. Horton did not engage in force balancing.  (R-PSMF ¶¶ 124-125, citing Mobley Dep. 170.)

On January 28, 2010, GPC issued Ms. Horton a written reminder for mishandling cash because she had left a bag containing cash and endorsed checks on the front counter instead of placing it in the safe.  (PSMF ¶¶ 126-127.)  However, as

---

testified that she received termination recommendations from Ms. Palmore and Ms. Molock, and then points out that neither one of them mentioned making a termination recommendation in their Declarations.  Ms. Harrison actually testified that she learned through Ms. Ellis that Workplace Ethics had made a recommendation that Ms. Mitchell should be fired, and that Internal Auditing had advised that Ms. Mitchell had engaged in classic force balancing.  (Harrison Dep. Vol. II 15-16, 18.)  The fact that Ms. Palmore (the internal auditor) and Ms. Molock (the Workplace Ethics investigator) made no mention of making a recommendation in their Declarations is immaterial.  What is undisputed is that, based on their understanding of GPC policy, Ms. Mitchell had engaged in force balancing. (Palmore Decl. ¶ 7; Molock Decl. ¶ 7.)

44

defendant again correctly responds, this fact is immaterial as Ms. Horton did not engage in force balancing.  (R-PSMF ¶¶ 126-127, citing Mobley Dep. 170.)

Finally, Ms. Mobley initially testified that she had no recollection of receiving a complaint that Ms. Horton had passed a counterfeit bill to a GPC customer; she corrected that testimony in her Declaration, where she avers that since the date of her deposition, she reviewed the performance notes maintained on Ms. Horton and saw a reference therein to that complaint.  (See PSMF ¶ 128.)  With her recollection refreshed, Ms. Mobley avers that on April 30, 2009, she received a complaint that Ms. Horton had received a counterfeit bill and passed it along to another customer. Ms. Mobley avers that she discussed this allegation with Ms. Horton, but never reported it to her manager, Ms. Harrison.  (Mobley Decl. ¶ 23.)  Like the other proposed facts about Ms. Horton, the Court concurs with GPC that this one is also immaterial.  (See R-PSMF ¶ 128.)  This is not force balancing; and there is no evidence that the decisionmaker here–Ms. Harrison–knew what Ms. Horton had reportedly done.

## I.   Evidence Related to Plaintiff's IIED Claim

Other than the fitness-for-duty evaluations conducted by Dr. Tillitski and her personal psychologist, plaintiff has not seen a doctor, psychologist, or other

healthcare professional for any alleged emotional distress, and she has not sought counseling or treatment as a result of any act or omission of GPC.  (DSMF ¶ 38; R-DSMF ¶ 38.)

### J.    After-Acquired Evidence

During her deposition on November 9, 2011, plaintiff admitted that she intentionally lied and made material omissions on her application for employment at GPC.  For example, Ms. Mitchell admitted that she had:  (1) lied on her application about attending Macon Junior College because she wanted a job; (2) lied about the length of time she attended Wesleyan College because she was "very young" (i.e., 30 years old); and (3) purposefully omitted a previous employer from her application because she had been terminated from that job.  (DSMF ¶ 35; R-DSMF ¶ 35.)  If Ms. Harrison had known about Ms. Mitchell's lies and omissions on her application during the time that she worked at GPC, Ms. Harrison would have terminated plaintiff's employment.  (DSMF ¶ 36; R-DSMF ¶ 36.)

## II.    SUMMARY JUDGMENT STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment

bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 840 (11th Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial" Celotex, 477 U.S. at 324.  Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  If in response the non-moving party does not sufficiently support an essential element of his case as to which he bears the burden of proof, summary judgment is appropriate. Rice-Lamar, 232 F.3d at 840.  "In determining whether genuine issues of material

47

fact exist, [the Court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." Id. (citing Anderson, 477 U.S. at 255); see also Hammer v. Slater, 20 F.3d 1137, 1141 (11th Cir. 1994) ("Once the moving party has met its initial burden by negating an essential element of the non-moving party's case, the burden on summary judgment shifts to the non-moving party to show the existence of a genuine issue of material fact. For issues on which the non-moving party will bear the burden of proof at trial, the non-moving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.") (citation and quotation marks omitted).

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact but rather to determine whether there are any such issues to be tried. Anderson, 477 U.S. at 251. The applicable substantive law will identify those facts that are material. Id. at 248. Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. Id. Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. For factual issues to be "genuine," they must have a real basis in the record. Matsushita

48

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  When the record

as a whole could not lead a rational trier of fact to find for the non-movant, there is

no "genuine issue for trial."  Id. at 587.

## III.   ANALYSIS

### A.   Plaintiff's ADA Claims

Plaintiff asserts that GPC violated the ADA because it regarded her as disabled

in September 2008 when it placed her on administrative leave and forced her to

undergo a FDE, which she asserts was an improper medical examination.  (See Pl.'s

Resp. 18-27.)[46]  Plaintiff also argues that GPC violated the ADA when it terminated

her employment in June 2009 in retaliation for having engaged in conduct protected

by the ADA.  (Id. at 27-30.)  The Court considers these claims separately below.[47]

---

[46] Plaintiff initially alleged that GPC also violated the ADA when it failed to limit the scope of the medical examination performed by Dr. Tillitski.  (First Am. Compl ¶ 71.)  However, plaintiff has not addressed that claim here; thus, the Court deems it abandoned.

[47] GPC sent plaintiff for the FDE in 2008.  Therefore, the ADA Amendments Act of 2008, Pub. L. No. 110-325, which became effective January 1, 2009, do not apply.  See Jones v. STOA Int'l/Fla., Inc., 422 F. App'x 851, 853 n.1 (11th Cir. 2011) (no indication Congress intended amendments to apply retroactively). Citations to the ADA herein are to its pre-amendment text.

1.      **Perceived Disability and the FDE**

    a.      **There Is No Probative Evidence that GPC Regarded Plaintiff as Disabled**

To state a case of unlawful discrimination under the ADA, plaintiff must first prove that she has a disability as defined by that statute.  Gordon v. E.L. Hamm & Assocs., Inc., 100 F.3d 907, 910-11 (11th Cir. 1996).  Ms. Mitchell asserts that she is disabled under 42 U.S.C. § 12102(2)(C).[48]  Under that provision, an individual is deemed to be disabled if he is "regarded as having an impairment" that substantially limits one or more major life activities.  Id.[49]

---

[48] Under the regulations in effect in 2008, Section 12102(2)(C) applies only to an individual who (1) has an impairment that does not substantially limit a major life activity, but is treated by an employer as though it does; (2) has an impairment that substantially limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a disability as recognized by the ADA.  29 C.F.R. § 1630.2(l); see also D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1228 (11th Cir. 2005).  The EEOC's regulations are entitled to substantial judicial deference.  Harrison v. Benchmark Electronics Huntsville, Inc., 593 F.3d 1206, 1215 n.9 (11th Cir. 2010).

[49] The terms "impairment," "substantially limits," and "major life activities" require further illumination.  Impairments can be physical or mental.  Ms. Mitchell alleges that GPC regarded her as having a mental impairment.  (See First Am. Compl. ¶ 67.)  Under the then-existing regulations, a mental impairment is "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2).  At the relevant time, the regulations defined the term "substantially limits" as follows:  "(i) Unable to perform a major life activity that the average

50

To avoid summary judgment, plaintiff must create a triable issue of fact showing both that GPC thought she had a mental impairment and that GPC thought this impairment substantially limited one of her major life activities. Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1230 (11th Cir. 1999). Plaintiff has not submitted any probative evidence showing that the individual who ordered the FDE–Mr. Miller–thought that she had a mental impairment and that it substantially limited one of her major life activities. In fact, the record shows the opposite. Mr. Miller avers that Ms. Ellis contacted him on September 12, 2008, and relayed that, during a meeting with her supervisors. Ms. Mitchell had cried, stated that she was depressed, and asked for help. (Miller Decl. ¶ 3.) Based on this information, he directed that Ms. Mitchell should undergo a FDE. (Id.) According to Mr. Miller:

> I did not know whether Ms. Mitchell had any sort of physical or mental impairment when I made the decision that she should undergo a fitness for duty evaluation and I did not believe that she was substantially limited in any major life activity. I never thought that Ms. Mitchell was disabled.

---

person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." Id. § 1630.2(j)(1). Finally, the regulations at that time defined "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. § 1630.2(i).

51

(Id. ¶ 5.)

Instead of disputing these statements, Ms. Mitchell argues that Mr. Miller was a "cat's paw," and that GPC's decision to send her for a FDE and its actions afterwards demonstrate that defendant regarded her as disabled.  (Pl.'s Resp. 23-25.) As for the first point, the cat's paw theory does not apply when there is no evidence that the decisionmaker (i.e., Mr. Miller) received a biased recommendation.  See Leach v. State Farm Mut. Auto. Ins. Co., 431 F. App'x 771, 777 n.7 (11th Cir. 2011). Ms. Ellis simply reported to Mr. Miller the undisputed facts–plaintiff cried, stated that she was depressed, and asked for help.  (Ellis Decl. ¶ 15.)  She made no recommendation, but instead had contacted Mr. Miller for assistance.

Moreover, the law is well settled that an employer's decision to send an employee for a FDE is not evidence that it regarded the employee as disabled. Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir. 1999); see also Tice v. Centre Area Transp. Auth., 247 F.3d 506, 514-16 (3d Cir. 2001) (employer's request for an FDE does not demonstrate that it regarded the plaintiff as disabled); Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 810 (6th Cir. 1999) (employer's perception that an employee's health problems are adversely affecting his job performance and directing that he undergo mental and physical examinations "is not

52

tantamount to regarding that employee as disabled"); <u>Cody v. CIGNA Healthcare of St. Louis, Inc.</u>, 139 F.3d 595, 599 (8th Cir. 1998) ("A request for an evaluation is not equivalent to treatment of the employee as though she were substantially impaired."); <u>Mickens v. Polk Cnty. Sch. Bd.</u>, 430 F. Supp. 2d 1265, 1274 (M.D. Fla. 2006) (school board's request that plaintiff undergo a psychological evaluation failed to establish that it regarded him as disabled); <u>Law v. Garden State Tanning</u>, 159 F. Supp.2d 787, 792 (E.D. Pa. 2001) ("The mere fact that [the employer] requested a mental examination does not by itself establish that [it] regarded [the plaintiff] as being disabled.").

Finally, the series of events which occurred after Mr. Miller directed that plaintiff undergo a FDE are immaterial. Although some of the letters GPC sent plaintiff contain some high-handed language, none of those events raise a disputed issue of material fact over whether Mr. Miller regarded plaintiff as disabled when he made the decision to send her for a FDE. In sum, there is no probative evidence that Mr. Miller (or any other GPC employee) regarded plaintiff as disabled. Therefore, summary judgment should be entered against plaintiff on her ADA claim asserting that defendant perceived her as disabled.

53

### b.     Request for FDE Did Not Violate the ADA

Pursuant to § 12112(d)(4)(A) of the ADA,

[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A).[50]

In order to show that a challenged medical inquiry was proper, an employer must demonstrate that (1) there was an objective, legitimate reason to question the employee's capacity to perform her duties, (2) a medical examination was required to determine whether the plaintiff could perform job-related duties, and (3) the examination requested was a "reasonably effective method" of achieving the employer's asserted business necessity.  Mickens, 430 F. Supp. 2d at 1279; see also Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007) (employer bears the burden of demonstrating business necessity); Tice, 247 F.3d at 518 ("The ADA's requirement

---

[50] The ADA's prohibition against improper medical inquiries applies to every employee, regardless of whether she is a qualified individual with a disability. Roberts v. Rayonier, Inc., No. 3:03-CV-55-J-025TEM, 2005 WL 3500320, at *2 n.1 (M.D. Fla. Dec. 21, 2005); see also Harrison, 593 F.3d at 1213-14.

54

that [a medical examination] be consistent with business necessity is an objective one.").[51]

Moreover, an employer does not have to wait until an employee's job performance suffers before requiring the employee undergo a FDE. See Brownfield v. City of Yakima, 612 F.3d 1140, 1145 (9th Cir. 2010) (rejecting plaintiff's argument that business necessity standard cannot be met without showing employee's job performance had suffered as a result of medical problems); Watson, 177 F.3d at 934-35 (finding medical inquiry of police officer who displayed "unusually defensive and antagonistic behavior towards his co-workers and supervisors" permissible under ADA).

"[T]he business necessity standard 'is quite high, and is not to be confused with mere expediency.'" Brownfield, 612 F.3d at 1146 (quoting Cripe v. City of San Jose, 261 F.3d 877, 890 (9th Cir. 2001)).

_____

[51] The EEOC's enforcement guidelines, which are not controlling but proper to consult for guidance, see Harrison, 593 F.3d at 1214, explain that a medical examination or disability-related inquiry may be "'job-related and consistent with business necessity' when "an employer 'has a reasonable belief, based on objective evidence, that . . . an employee's ability to perform essential job functions will be impaired by a medical condition." See EEOC, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations Of Employees Under the Americans with Disabilities Act, Notice No. 915.002, ¶ 5 (July 27, 2000), available at http://www.eeoc.gov/policy/docs/guidance-inquiries.html.

> Nevertheless, . . . the business necessity standard may be met even before an employee's work performance declines if the employer is faced with
>
>> significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job.  An employee's behavior cannot be merely annoying or inefficient to justify an examination; rather, there must be genuine reason to doubt whether that employee can perform job-related functions.

Id. (quoting Sullivan, 197 F.3d at 811); see also Conroy v. N.Y. State Dep't of Corr. Servs., 333 F.3d 88, 98 (2d Cir. 2003) (medical examination permissible when, for example, "the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties"); Coffman v. Indianapolis Fire Dep't, 578 F.3d 559, 565-66 (7th Cir. 2009) (where multiple co-workers and supervisors had expressed concern that plaintiff did not seem like herself, but seemed withdrawn and defensive, employer's decision to refer plaintiff for FDE was job-related and consistent with business necessity).

Here, the undisputed evidence demonstrates that GPC had a legitimate, non-discriminatory reason to doubt plaintiff's capacity to perform her duties as a CSR. She worked in a position where she interacted extensively with customers and co-workers.  During a meeting with her managers, plaintiff became very upset and cried,

56

stated that she was depressed, and asked for help.  In other words, her behavior was not simply "annoying or inefficient."  Brownfield, 612 F.3d at 1146.  Ms. Ellis then called Mr. Miller who, after hearing a description of plaintiff's behavior at the meeting, directed that she undergo a FDE.

Requesting a psychological examination under those circumstances was a reasonably effective means to determine if plaintiff could perform her duties.  See Mickens, 430 F. Supp. 2d at 1280 ("Requesting a psychological examination constitutes 'a reasonably effective method' of achieving the [defendant's] goal of determining whether [the plaintiff] could perform his duties."); Fritsch v. City of Chula Vista, No. 98-0972-E-CGA, 2000 WL 1740914, at *6 (S.D. Cal. Feb. 22, 2000) ("It was reasonable and appropriate for the employer to seek the guidance of a mental health worker, and to follow that advice.  This procedure allowed the employer to gather the necessary information to allay its reasonable fears that an employee was unfit to perform her job responsibilities."); Cody, 139 F.3d at 599 ("Employers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims.").[52]  An employer's

---

[52] The above discussion shows that numerous courts have allowed employers to request FDEs without violating the ADA.  Plaintiff does not address these cases, but relies instead one case (Mahoney v. Ernst & Young, LLP, 487 F. Supp. 2d 780

concern for an employee's emotional well being should not create liability.  See Johnson v. Boardman Petroleum, Inc., 923 F. Supp. 1563, 1568-69 (S.D. Ga. 1996) ("This suit flies in the face of the policy concerns underlying the ADA because it encourages employers to dehumanize their relationships with their employees for fear that showing concern for and recognizing their employees' emotional problems would land them in court facing a discrimination claim based upon a perceived mental disability.").

In sum, the undisputed evidence reveals sufficient justification for requiring plaintiff to undergo a FDE.  Thus, defendant complied with § 12112(d)(4)(A)'s job-relatedness and business-necessity requirements when it insisted that plaintiff be evaluated for her fitness for duty or face termination.  Accordingly, summary judgment should be entered for defendant on plaintiff's disability discrimination claim related to the FDE.

## 2.    The Retaliation Claim Fails as a Matter of Law

A prima facie case of ADA retaliation contains three elements:  (1) the plaintiff engaged in statutorily protected conduct; (2) the plaintiff suffered an adverse

_____

(S.D. Tex. 2006)), and two administrative decisions from the EEOC's Office of Federal Operations.  (Pl.'s Resp. 21-22.)  The Court declines to follow these non-binding authorities.

employment action; and (3) the adverse action was causally related to the protected expression. Williams v. Motorola, Inc., 303 F.3d 1284, 1291 (11th Cir. 2002). "The failure to satisfy any of these elements is fatal to a complaint of retaliation." Higdon v. Jackson, 393 F.3d 1211, 1219 (11th Cir. 2004).

It is undisputed that Ms. Mitchell engaged in statutorily protected conduct when her attorney sent a letter to GPC's attorney on December 8, 2008, threatening to file a charge if she were not reinstated, and when she filed a charge with the EEOC on March 9, 2009. It is also undisputed that Ms. Mitchell suffered an adverse employment action when she was discharged on June 10, 2009. The issue then is whether plaintiff has submitted probative evidence creating a triable issue causally linking that adverse action to the protected activity. "[T]he causal link requirement . . . must be construed broadly; 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998) (quoting E.E.O.C. v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993)).

A plaintiff satisfies this casual-link element if she provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action. Higdon, 393 F.3d at 1220.

59

With regard to the knowledge component, there is no evidence that the decisionmaker on plaintiff's termination (Ms. Harrison) knew of the letter that plaintiff's counsel sent to GPC's counsel in December 2008 threatening to file an EEOC charge if her client were not reinstated.[53]  See Thomas v. Miami Veterans Medical Center, 290 F. App'x 317, 320 (11th Cir. 2008) (per curiam) (to establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct; constructive knowledge insufficient).

It is undisputed that Ms. Harrison knew of plaintiff's March 9, 2009, EEOC charge.  However, there is not close temporal proximity between Ms. Harrison's awareness of that March 9, 2009 charge and the June 10, 2009, termination.  Three months passed between these two events.  In this Circuit, a three-month period between protected expression and an adverse employment action "does not allow a reasonable inference of a causal relation between the protected expression and the adverse action."  Higdon, 393 F.3d at 1221; see also Thomas v. CVS/Pharmacy, 336

---

[53] Therefore, the January 2009 comment that Ms. Cole attributes to Ms. Harrison (i.e., that if Ms. Mitchell made "one wrong move she was 'outta here'") was not motivated by the December 2008 letter from plaintiff's counsel.  Moreover, Ms. Harrison allegedly made this comment well before plaintiff filed her EEOC charge.

F. App'x 913, 915 (11th Cir. 2009); accord King v. Kennesaw State Univ., No. 1:05-CV-3169-TWT, 2007 WL 2713252, at *17 (N.D. Ga. Sept. 13, 2007).

Even if the Court could infer a causal connection despite the passage of three months between the protected expression and the termination, "[i]ntervening acts of misconduct can break any causal link between the protected conduct and the adverse employment action." Henderson v. FedEx Express, 442 F. App'x 502, 506 (11th Cir. 2011). The record shows that Ms. Mitchell's acts of force balancing in May 2009 broke any possible causal connection between the March 2009 EEOC charge and the June 2009 termination.

It is undisputed that GPC's policies prohibit force balancing. (See R-DSMF ¶ 18.) On three separate occasions in one month, plaintiff reported that she was in balance in the computer system when, in fact, she was out of balance. (Id. ¶¶ 20-24.) When these instances were reported to Ms. Harrison, she asked Internal Auditing to investigate. (Id. ¶¶ 25-26.) Internal Auditing determined that plaintiff had engaged in "classic force balancing." (Id. ¶¶ 27-28.) Based on Internal Auditing's determination that plaintiff had force balanced, Ms. Harrison decided to terminate her employment. (Id. ¶ 29.)

61

Plaintiff makes a number of arguments which she claims support the causation prong. (Pl.'s Resp. 28-29.)  As shown below, these arguments are without merit. First, plaintiff points to Ms. Harrison's comment to Ms. Cole that plaintiff would be "outta here" on her first mistake.  However, this comment was made in January 2009; thus, it could not be evidence of retaliatory intent for a charge that was not filed until March 2009.

Plaintiff also claims that evidence of a causal connection exists in the fact that she was the first person ever terminated for force balancing.  (Pl.'s Resp. 29.) However, as previously discussed, that claim is incorrect.  Plaintiff was the first person that Ms. Harrison terminated for force balancing, and she subsequently terminated Ms. Cole for the same reason.  Plaintiff also complains that she was not terminated for force balancing until Ms. Harrison learned of it.  (Id.)  That is not surprising, because Ms. Harrison served as the Central Region Customer Service Manager, and she could not act on something until she knew of it.  According to the undisputed facts, Ms. Mobley brought the matter to Ms. Harrison's attention as soon as she could.  Plaintiff further argues that GPC's own policies discredit Ms. Harrison's testimony that GPC has a "zero tolerance" for force balancing.  (Id.) Plaintiff fails to identify which policies contradict Ms. Harrison's testimony, and as

previously addressed, GPC's policies allow for immediate termination for serious infractions or violations of company policy.  Plaintiff also argues that Ms. Harrison failed to follow GPC's Positive Discipline Policy in terminating her employment. (Id.)  However, as also discussed above, Ms. Harrison did follow that Policy, which allows for immediate termination.

Finally, plaintiff argues that other individuals who had committed what she believes were "more egregious" violations of the money-handling policy were not terminated.  (Pl.'s Resp. 29.)  Although plaintiff does not identify those other employees or the money-handling policy, the Court assumes that Ms. Mitchell is comparing herself to Ms. Horton.  However, a comparator's misconduct must be "nearly identical" to the plaintiff's in order to prevent courts from second-guessing an employer's reasonable decisions, and "an employee who may have broken a rule but was not caught [is] not similarly situated to one who [has] been caught."  Amos v. Tyson Foods, Inc., 153 F. App'x 637, 647 (11th Cir. 2005) (per curiam).  It is undisputed that Ms. Horton did not engage in force balancing.  Because her offense was not the same as plaintiff's, Ms. Horton is not a proper comparator.  Moreover, there is no evidence that Ms. Harrison knew of Ms. Horton's alleged violations. Because plaintiff has failed to establish a prima facie retaliation claim, summary

63

judgment should be entered for defendant.  See Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1433 (11th Cir. 1998) ("[S]ummary judgment against the plaintiff is appropriate if he fails to satisfy any one of the elements of a prima facie case.").

Even assuming that plaintiff had established a prima facie case, she must raise a triable issue over whether defendant's articulated reason for discharging her–force balancing–was a pretext for retaliation.  See Standard v A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332 (11th Cir. 1998) (plaintiff may establish pretext "(1) by showing that the legitimate non-[retaliatory] reasons should not be believed; or (2) by showing that, in light of all of the evidence, [retaliatory] reasons more likely motivated the decision than the proffered reasons").

The Court has already dealt with many of the contentions that plaintiff makes in her effort to establish pretext, either in the Statement of Facts or in addressing her failure to establish a prima facie retaliation claim.  Thus, the Court will not address them again, but will simply note that it is undisputed that GPC, in its interpretation of its policies, believed that plaintiff had engaged in force balancing.  The relevant managers and investigators–Ms. Harrison, Ms. Mobley, Ms. Palmore, and Ms. Molock–all confirm that fact.  Although plaintiff argues that GPC broadened the definition of force balancing beyond what she understood it to mean, the policy

64

defines force balancing in a broad way, because it can happen in many different ways.

No reasonable jury could reach any other conclusion but that plaintiff engaged in force balancing. An employee who handles money must know that, if a cash drawer contains $2,674.51 (as plaintiff's did on May 5, 2009), then she must <u>not</u> write a deposit ticket for $2,664.51 (as plaintiff did on May 5). The only reasonable conclusion one could draw is that, for whatever reason, plaintiff filled out the deposit ticket to match the number the computer said should have been in her drawer based on transactions she had entered in the system.[54] This action gave the appearance that plaintiff's drawer was in balance when it was not.

Ms. Harrison's understanding of GPC policy was that employees who engage in force balancing must be fired on the first offense. It is immaterial that the policy was not in writing. Plaintiff has no evidence that she was treated differently than any other similarly-situated CSR. Indeed, Ms. Harrison fired Ms. Cole for the same

---

[54] Although plaintiff did not rely on the following assertion in her brief, she avers in her Declaration that she made an "honest counting error," perhaps caused by bills sticking together in the cash counter. (Mitchell Decl. ¶ 14.) However, plaintiff flatly contradicted that assertion in her deposition, where she testified that the amount of cash she counted on May 5 was correct and that she purposefully entered a different number into the computer system and deposit ticket. (Mitchell Dep. 153-55, 160-61.)

reason.  Moreover, plaintiff's discharge did not violate the Positive Discipline Policy, which allows for immediate termination for serious offenses.

Plaintiff obviously feels that it was not "fair" for Ms. Harrison to terminate her without progressive discipline, but in the absence of any illegal retaliation, this Court is not free to second guess GPC's business decision.  See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law.  We are not in the business of adjudging whether employment decisions are prudent or fair." (citation omitted)); Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a [retaliatory] reason.").  For these reasons, summary judgment should be entered for defendant on plaintiff's ADA retaliation claim.

**B.    Plaintiff's State Law Tort Claims**

**1.    Intentional Infliction of Emotional Distress**

To establish an IIED claim, a plaintiff must show the following:  (1) the defendant's conduct was intentional or reckless; (2) the conduct was extreme and

66

outrageous; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress.  Bridges v. Winn-Dixie Atlanta, Inc., 335 S.E.2d 445, 447-48 (Ga. Ct. App. 1985); see also Yarbray v. So. Bell Tel. & Tel. Co., 409 S.E.2d 835, 837-38 (Ga. 1991).  Whether a claim rises to the requisite level of outrageousness and egregiousness is a question of law to be determined by the court. Yarbray, 409 S.E.2d at 838.  Liability has been found only where the defendant's conduct was "'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Kaiser v. Tara Ford, Inc., 546 S.E.2d 861, 868 (Ga. Ct. App. 2001) (quoting McClung Surveying v. Worl, 541 S.E.2d 703, 707 (2000) (internal quotation marks omitted)).  Failure to present evidence that creates a disputed issue as to all of the four elements requires entry of summary judgment.  Gaston v. So. Bell Tel. & Tel. Co., 674 F. Supp. 347, 352 (N.D. Ga. 1987).

A plaintiff carries a "stringent" burden in proving an IIED claim.  Bridges, 335 S.E.2d at 447; see also Pierri v. Cingular Wireless, LLC, 397 F. Supp. 2d 1364, 1381 (N.D. Ga. 2005) ("The burden on a plaintiff is a 'stringent one.'") (quoting Ingram v. JIK Realty Co., 404 S.E.2d 802, 804 (Ga. Ct. App. 1991)).  It is clear that tasteless and rude social conduct, such as insults, indignities, threats, and petty oppression, is

not actionable.  <u>Kornegay v. Mundy</u>, 379 S.E.2d 14, 16 (Ga. Ct. App. 1989).  Indeed,

<u>Kornegay</u> teaches that

> "[t]he rough edges of our society are still in need of . . . filing down,
> and in the meantime plaintiffs must necessarily be expected and
> required to be hardened to a certain amount of rough language, and to
> occasional acts that are definitely inconsiderate and unkind.  There is
> no occasion for the law to intervene in every case where someone's
> feelings are hurt."

<u>Id.</u> (alteration in original) (<u>quoting</u> <u>Moses v. Prudential Ins. Co. of Am.</u>, 369 S.E.2d

541, 544 (Ga. Ct. App. 1988)).  "Generally, Georgia law does not consider adverse

employment actions 'extreme or outrageous.'"  <u>Pierri</u>, 397 F. Supp. 2d at 1381; <u>see</u>

<u>also</u> <u>Miraliakbari v. Pennicooke</u>, 561 S.E.2d 483, 486-88 (Ga. Ct. App. 2002)

(termination of employee, despite manager's reckless, wanton, harsh, and insensitive

conduct, was not so extreme as to go beyond all reasonable bounds of decency, and

to be regarded as atrocious and utterly intolerable in a civilized community).

A plaintiff must also be able to show that the emotional distress she suffered

was extreme and "so severe that no reasonable man could be expected to endure

it . . . It is for the court to determine whether on the evidence severe emotional

distress can be found."  <u>Bridges</u>, 335 S.E.2d at 448 (<u>quoting</u> Restatement (Second)

of Torts § 46(1) cmt. j (1965)).  Thus, without any evidence of severe emotional

68

distress, the Court should not allow plaintiff to take an IIED claim before a jury.

It is apparent that plaintiff has placed little credence in her IIED claim, as her response to defendant's motion for summary judgment is only two paragraphs long. (See Pl.'s Resp. 34.)  She asserts that a jury could find that GPC's decision to send her for a fitness-for-duty evaluation and its requirement that she sign a release for her medical records was extreme and outrageous.  However, she cites no authority for that proposition.  In addition, plaintiff asserts that the psychologists who conducted the medical evaluations here saw that GPC's actions had caused her emotional distress.  (Id.)

It is clear that the adverse employment actions alleged here–placement on administrative leave for a FDE and alleged retaliatory discharge–were not "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  Kaiser, 546 S.E.2d at 868 (internal quotation marks omitted).  Moreover, plaintiff has failed to show that she suffered severe emotional distress.  See Southland Propane, Inc. v. McWhorter, 720 S.E.2d 270, 277 (Ga. Ct. App. 2011) (Emotional distress can take the form of "'highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea.  It

is only where it is *extreme* that liability arises.'") (quoting <u>Abdul-Malik v. AirTran</u> <u>Airways, Inc.</u>, 678 S.E.2d 555, 560 (Ga. Ct. App. 2009)); <u>Ellison v. Burger King</u> <u>Corp.</u>, 670 S.E.2d 469, 473 (Ga. Ct. App. 2008) ("[T]he conduct must inflict emotional distress so severe that no reasonable person could be expected to endure it.") (internal quotation marks omitted).

Ms. Mitchell has not seen a health care professional for any issues related to her alleged mistreatment by GPC.  The unspecified emotional distress she alleges is insufficient under Georgia law. <u>See</u> <u>Witter v. Delta Airlines, Inc.</u>, 966 F. Supp. 1193, 1201 (N.D. Ga. 1997) (alleged symptoms of emotional distress including anxiety, sleeplessness, overeating, diarrhea, and headaches, while not minor, clearly not of the type that no reasonable man could be expected to endure), <u>aff'd</u>, 138 F.3d 1366 (11th Cir. 1998).[55]  Because the evidence in this case clearly fails to show that

---

[55] Other relevant authority includes:  <u>Jones v. Warner</u>, 686 S.E.2d 835, 839 (Ga. Ct. App. 2009) (anxiety, nervousness, sleeplessness, and irritability for one month following incident, coupled with failure to seek medical or psychiatric treatment for these symptoms, insufficient to show severe emotional distress); <u>Abdul-Malik</u>, 678 S.E.2d at 560 (sleeplessness and weight gain insufficient to establish severe emotional distress; plaintiff also failed to seek professional help); <u>Odem v. Pace Acad.</u>, 510 S.E.2d 326, 333 (Ga. Ct. App. 1998) (emotional distress not sufficiently severe where plaintiff suffered marginally high blood pressure but sought no professional advice).

defendant's actions were outrageous or that Ms. Mitchell suffered severe emotional distress, summary judgment should be entered against plaintiff's IIED claim.

### 2.   Invasion of Privacy

Georgia law recognizes four related but different invasion of privacy claims: (1) intrusion upon the plaintiff's seclusion or solitude, or into her private affairs; (2) public disclosure of embarrassing private facts; (3) publicity that places the plaintiff in a false light in the public eye; and (4) appropriation of the plaintiff's name and likeness.  Thomas v. Food Lion, LLC, 570 S.E.2d 18, 21 (Ga. Ct. App. 2002); see also Pierri, 397 F. Supp. 2d at 1382.

Plaintiff contends that her claim is the first type–intrusion into seclusion. (Pl.'s Resp. 34.)[56]  She argues that GPC intruded upon her seclusion by requiring her (on threat of termination) to undergo a FDE and to sign a medical records release (which GPC used to obtain the results of that evaluation).  (Id. at 34-35.)[57]

---

[56] In its motion for summary judgment, GPC also construed the Amended Complaint as asserting a claim based on the second of the four types of invasion of privacy claims, i.e., public disclosure of embarrassing private facts.  (See Def.'s Br. 24.)  However, plaintiff did not respond to that argument; thus, the Court deems any such claim abandoned.  See Burnette, 342 F. Supp. 2d at 1140.

[57] Ms. Mitchell also asserts that a letter she received from Ms. Harrison quotes directly from a report prepared by one of her medical providers, thus creating a triable issue over whether GPC violated her right to privacy.  (Pl.'s Resp. 35.)

AO 72A
(Rev.8/82)

The cause of action for intrusion into seclusion exists to protect the "integrity and sanctity of physical areas a person would naturally consider private and off limits to uninvited, unwelcomed, prying persons." Cummings v. Walsh Constr. Co., 561 F. Supp. 872, 884 (S.D. Ga. 1983). "To establish a claim of 'intrusion,' a plaintiff must usually establish that the defendant committed a physical intrusion, analogous to trespass, into the plaintiff's solitude or private affairs." Pierri, 397 F. Supp. 2d at 1382. The Pierri court provided examples of such intrusion by quoting the following excerpt from a learned treatise:

> physical intrusion into a place in which the plaintiff has secluded himself . . . the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires . . . [or] some other form of investigation or

---

Unfortunately, plaintiff identifies neither the letter nor the report. Given the assertion in PSMF ¶ 70, Ms. Mitchell may be referring to Ms. Harrison's letter of October 30, 2008 (Mitchell Dep. Ex. 20 [52-1] 89-90), in which she mentions Dr. Tillitski's completed evaluation (id. Ex. 40 [52-2] 55-64). However, Ms. Harrison's letter (prepared for her by GPC's Disability Management Department) does not quote from Dr. Tillitski's report. Instead, Ms. Harrison wrote in pertinent part as follows: "We have now received the result of this evaluation and Dr. Tillitski informs us that you are not able to return to work at this time due to your inability to work with others. Of course, working with others is an essential function of your [CSR] position." (Id. Ex. 20 [52-1] 89.) Moreover, Ms. Harrison avers that she "was never given and . . . never reviewed any reports from Dr. Tillitski." (Harrison Decl. ¶ 20.) Thus, plaintiff has submitted no probative evidence that Ms. Harrison (or anyone else at GPC) disclosed any of her private medical information.

AO 72A
(Rev.8/82)

examination into his private concerns, as by opening his . . . mail, searching his safe or his wallet, examining his private bank account.

Id. at 1383 (quoting Restatement (second) of Torts § 652B cmt. b (1965)).

The record contains no evidence showing that Ms. Mitchell was subjected to a physical intrusion analogous to a trespass. Moreover, plaintiff fails to explain how what happened here is remotely akin to that intrusion tort. She cites only one case, King v. State, 535 S.E.2d 492 (Ga. 2000), to support her contention that one's privacy in medical records is protected. (See Pl.'s Resp. 35.) However, that case is inapposite, because it is a criminal case in which the court reversed the defendant's DUI conviction after finding that medical records are protected by the fundamental constitutional right of privacy, and concluding that the prosecutor's use of an ex parte subpoena to a hospital to obtain those records without her consent violated that fundamental right. King, 535 S.E.2d at 495-96.

In this case, GPC is not a state actor; thus, the constitutional prohibitions in King are not present. Moreover, Ms. Mitchell signed a release. Although she claims that she did so only to avoid the loss of her job, that does not obviate her consent. See Thomas, 483 F.3d at 532-33 (being forced to undergo a FDE under threat of termination is not an unreasonable intrusion and does not constitute invasion of

73

privacy).  Therefore, given the lack of legal and factual support for the invasion of privacy claim, summary judgment should be entered against plaintiff. See Pierri, 397 F. Supp. 2d at 1383 (entering summary judgment where plaintiff "alleged no facts supporting an unreasonable intrusion tantamount to a trespass").

**IV.**   **CONCLUSION**

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [51] be **GRANTED,** and **ORDERS** that Defendant's Motion to Strike [76] be **GRANTED IN PART**.

The Clerk is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO ORDERED and RECOMMENDED**, this 10th day of July, 2012.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)